**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Willie CALHOUN, a/k/a Calvin Calhoun, Defendant-Appellant.**

No. 76–1044.

United States Court of Appeals, Sixth Circuit.

Argued June 22, 1976.

Decided Nov. 2, 1976.

Martin J. Marinelli, Bingle, Merrit & Marinelli, Toledo, Ohio, for defendant-appellant.

Frederick M. Coleman, U.S. Atty., James D. Jensen, Reginald S. Jackson, Jr., Toledo, Ohio, for plaintiff-appellee.

Before PHILLIPS, Chief Judge, LIVELY and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

Appellant Willie Calhoun was found guilty by a district court jury of the armed robbery of the Toledo Home Federal Savings & Loan Association on July 29, 1974, in violation of 18 U.S.C. § 2113(d). The sole issue in his direct appeal is the propriety of the use by the government in its case-in-chief of the testimony of Calhoun's parole officer who identified Calhoun as the robber shown in a bank surveillance photograph.

The bank robbery occurred during daylight hours and was witnessed by two female tellers and one Glenna Porter, the confessed driver of the getaway car. At the time of the trial one of the bank tellers was unable to testify, ostensibly because her husband had just suffered a heart attack. It was stipulated, however, that she would have testified that she did not recognize Calhoun because she kept her face down during the entire robbery. The other teller was unable to make a positive identification, but did testify that Calhoun looked similar to the robber. Positive identification was made by Ms. Porter. Ms. Porter had earlier pled guilty to the bank robbery charge in the Lucas County Common Pleas Court and had served 60 days in jail before being released on probation. Calhoun contends that Porter's plea of guilty and her self-interest in protecting her status as a probationer casts doubt upon her credibility.

Porter testified that she had not known Calhoun prior to the day of the robbery, nor had she seen him thereafter. She testified that before the robbery, she picked up Calhoun at his home, that she bought shoe polish from a drugstore and then watched Calhoun put the shoe polish on his face before going into the bank. Contrasting Calhoun's appearance at trial, Porter testified that at the time of the robbery Calhoun had sideburns, goatee, mustache and a fuzzy hat as shown in the bank surveillance photographs.

What happened thereafter is best described directly from the record. The following took place out of the presence of the jury between Mr. Chapman, Assistant United States Attorney, the court, and Mr. Moore, Calhoun's counsel:

"MR. CHAPMAN: First of all, I'd like to state for the record that the government plans to call as its next witness Bruce Snyder, and that the purpose in the government calling this witness is because. we believe that Mr. Snyder will be able to positively identify Willie Calhoun in the photographs marked as Government's Exhibits 3 through 7, from Mr. Snyder's prior association.

For the record and out of the hearing of the jury, I will indicate that Mr. Snyder is employed as a parole and probation officer for the State of Ohio. That I have instructed him not to make any reference to that fact on my questioning on direct or redirect examination, and that his testimony will be restricted solely to the fact he is acquainted with Mr. Calhoun—has seen him approximately 10 times—and bases his identification on that acquaintance.

THE COURT: Mister Moore, do you want to state your objection?

MR. MOORE: Let the record show defendant's counsel objects strenuously to this method of identification. Defense counsel, due to the fact that Mr. Snyder is Mr. Calhoun's probation officer, will be severely limited on cross examination to the very vital point, that is Mr. Snyder's ability to identify. In other words, I can not go at any length as to the interviews, the type of the interviews, exactly what his relationship was, and I feel that it will prejudice the defendant's case.

The prosecution, or the district attorney, has an opportunity to get in the same type of evidence by a brother of Rodney or half-brother, according to F.B.I. reports of Rodney King, who states he knows Willie Calhoun, that he can identify him. He also knows that Willie Calhoun also knows Rodney King. So, I feel that the jury is going to suspect something when they hear this testimony which by its very nature will have to be somewhat circumspect.

THE COURT: At this point, Mr. Moore I will overrule the objection. The fact that Mr. Snyder is Mr. Calhoun's probation or parole officer will not be brought out as part of the prosecution's case and can only be brought out by error.

I don't think you will be limited in your cross examination as to the frequency or times or places. And if you bring out why he was meeting with him, that will be up to you, but I think you can attest his identification adequately.

MR. MOORE: How friendly are they? —that's the point.

MR. CHAPMAN: You can ask that question.

THE COURT: The answer at that point, Mr. Snyder, should be you are business acquaintances.

And I will caution the witness not to mention anything about being a probation or parole officer, or particularly Mr. Calhoun's, that you have no control over him at this time. By reason of business relations you are not free to talk about it. You have met him on 10 occasions, and you can identify him.

You understand that?

MR. SNYDER: Yes.

THE COURT: The objection, for the record, will be overruled."

Thereafter the government, over the continued objection of the defense, called parole officer Bruce Snyder. The direct and cross examination of Mr. Snyder which then took place before the jury is set out in the margin.[1]

In exercising our responsibilities to review the propriety of the challenged testi-

---

1. (By Mr. Chapman)

"Mister Snyder, are you acquainted with the defendant in this case Willie Calhoun, Calvin Calhoun?

A. Yes I am.

\* \* \* \* \* \*

Q. When's the first time that you met Mr. Calhoun, please?

A. April 22nd, 1974.

Q. Okay. From April 22nd, 1974, up to July 29 of 1974 about how many times did you see and talk with Mr. Calhoun?

A. Approximately nine or ten times.

Q. Okay. And approximately how long would each of those conversations last, roughly?

mony, we do so with the understanding first, that the parole officer was offered as a lay witness and not as an expert witness, and second, that the government concedes there was no showing of any necessity for employing Calhoun's parole officer for identification instead of some other witness whose relationship to Calhoun would not pose the instant problem.[2] We emphasize that this case does not involve the propriety of testimony by a res gestae witness who coincidentally may have had a prior relationship with the defendant based on defendant's past criminal conduct. We finally note that no basis existed in the instant case for the interjection into the trial of Calhoun's status as a parolee.

Defendant on appeal argues that the district court erred in admitting opinion evidence that the person in the bank photograph was the defendant. Appellant also argues that the dilemma posed by the government's use of Snyder as an identification witness denied Calhoun's constitutional right to confrontation under the Sixth Amendment. See Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

Upon careful consideration, we elect not to reach the constitutional issues and hold instead that, upon the record here, it was an abuse of discretion by the trial judge to have permitted the testimony by

A. They would vary from 15 minutes to possibly an hour.

\* \* \* \* \* \*

Q. All right. Mister Snyder, I am going to show you what has been marked government Ex. 3 [surveillance photo of robber] and ask you, please, to look very carefully at this photograph if you would, think of the occasions you have had to see Mr. Calhoun in the past, I will ask you to look at that photograph and tell the jury, please, whether or not you can identify anyone in that photograph?

A. I believe the picture marked G--R–P is Willie Calhoun.

Q. Okay. From your view of that, how confident are you that that's Mr. Calhoun in that picture?

A. I'm sure it is Willie Calhoun.

Q. Why are you sure?

A. Well, most of his face is visible, and from my meetings with Willie I believe that is him.

\* \* \* \* \* \*

CROSS EXAMINATION
BY MR. MOORE:

Q. You said the last time you saw him was July 26, 1974?

A. Yes.

Q. And you testified that you have met with him approximately nine or ten times?

A. Correct.

Q. And that the duration of these meetings lasted anywhere from 15 minutes to one hour?

A. Right.

Q. So you would be pretty familiar with the man and his appearance, is that correct?

A. Fairly, yes.

Q. Do you recall what___during the month of July did you meet with him at any other times than on the 26th?

A. Yes. I believe I had one or two other meetings with him.

Q. So you met with him at least three times during the month of July?

A. Approximately, yes.

Q. Do you recall whether his hair was the same as it is today?

A. I believe it was similar to that, yes.

Q. I see.

A. Possibly a little shorter.

Q. Okay. Did he have a mustache at that time?

A. He had, he had some facial hair. I don't recall if it was a mustache, goatee, sideburns, what it was.

Q. You don't recall whether he had a goatee, mustache, or sideburns?

A. I'm not clear exactly what it was. He did have some facial hair.

2. This question has two aspects. Insofar as the necessity for opinion evidence itself is concerned, the Advisory Committee's Note to Rule 701 indicates that its simplified rule was intended to eliminate the showing of necessity as a standard for permitting lay opinions and conclusions because it had "proved too elusive and too unadaptable to particular situations for purposes of satisfactory judicial administration". Not covered by the rule is the quite separate question of whether, assuming such opinion testimony is in fact necessary, it is equally necessary that the opinion be given by a parole officer whose very status poses the danger of disclosure of a defendant's past criminal record. We do not pass on the question of whether demonstrated necessity would justify calling the parole officer nor do we speculate on what circumstances, if any, might constitute such a showing other than to observe that we find none here.

the parole officer. We further conclude that the error affected the substantial rights of the defendant and was not harmless within the meaning of Rule 52, Federal Rules of Criminal Procedure.

We think it is important to note here that it is not claimed that Snyder's opinion testimony was that of an expert and thus subject to the more specialized rules concerning expert opinion testimony embodied in Rule 702, Federal Rules of Evidence. Unlike *United States v. Cairns,* 434 F.2d 643, 644 (9th Cir. 1970); *United States v. Brown,* 501 F.2d 146, 148 (9th Cir. 1974), *reversed on other grounds, United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *United States v. Green,* 525 F.2d 386, 391 (8th Cir. 1975), and *United States v. Trejo,* 501 F.2d 138, 142 (9th Cir. 1974), it cannot be claimed that Snyder was possessed of any expertise superior to that of the jury. *See also United States v. Burke,* 506 F.2d 1165, 1170 (9th Cir. 1974) *cert. den.* 421 U.S. 915, 95 S.Ct. 1576, 43 L.Ed.2d 781 (1975); *United States v. Fernandez,* 480 F.2d 726, 739 (2d Cir. 1973). On the contrary, Snyder's testimony was offered solely as that of a lay witness whose close familiarity with Calhoun at the time of the robbery enabled him to make an ordinary identification of Calhoun, as he then appeared, from the surveillance photograph which had been offered and received in evidence. *See United States v. Murray,* 523 F.2d 489, 491, n. 1 (8th Cir. 1975).

Rule 701 of the Federal Rules of Evidence governs opinion testimony by lay witnesses:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

In considering Snyder's testimony as a lay witness, we note that his testimony or indeed the testimony of anyone who might have known Calhoun at the time, teases the outer limits of Rule 701. The bank surveillance photos themselves had already been received in evidence. The jury could see both the photographs and Mr. Calhoun.

An examination of the testimony given by Snyder shows that it meets the requirement of Rule 701(a) as being rationally based on the perception of the witness. However, whether this testimony was "helpful to the determination of a fact in issue" under Rule 701(b) is not at all clear. According to the testimony of Glenna Porter, at least, Calhoun's appearance at the time of trial was different from that on the day of the offense. Thus one intimately acquainted with Calhoun at the time of the robbery might conceivably be in a better position than the jury to recall his appearance then and compare it with a photograph. However, Snyder was in fact uncertain whether at the time of the robbery Calhoun had a mustache, goatee, or sideburns; the only certainty was that he had "facial hair" of some kind. We also question whether Snyder's testimony was merely an "attempt . . . to introduce meaningless assertions which amount to little more than choosing up sides." Advisory Committee's Note on Rule 701. However, the main defect in permitting Snyder to testify was that his broad assertion could not be tempered or probed by cross-examination. The defendant could not explore the possible motives his parole officer might harbor in positively identifying him as the robber. *See United States v. Garrett,* 542 F.2d 23 (6th Cir. 1976). The defendant could not freely examine the relationship with Snyder on which Snyder's perception was founded. The natural antidote to an abuse of the expanded rule of evidence was frustrated.

> The rule assumes that the natural characteristics of the adversary system will generally lead to an acceptable result, since the detailed account carries more conviction than the broad assertion, and a lawyer can be expected to display his witness to the best advantage. If he fails to do so, cross-examination and argument will point up the weakness[es].

Advisory Committee Note on Rule 701.

We find fortification for our construction of Rule 701 in the provisions of Rule 403, Federal Rules of Evidence:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The Advisory Committee's Note to Rule 403 observes that:

> Exclusion for risk of unfair prejudice, confusion of issues, misleading the jury, or waste of time, all find ample support in the authorities. 'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.

We conclude that the employment of the parole officer's testimony, though perhaps otherwise relevant, should have been excluded because its probative value is substantially outweighed by the danger of unfair prejudice as defined by Rule 403. Even though a more complete and uninhibited examination of Snyder might not have brought out the precise crime for which Calhoun was then on parole, the fact that he was on parole itself may have been even more prejudicial than the jury's simple knowledge of his prior conviction of a felony. Parole suggests to the jury that the crime was recent and that it was one which required imprisonment. The knowledge that Calhoun was on parole at the time of the alleged offense could also arouse an emotional reaction among the jurors, especially those who harbor strong feelings about recidivism and the premature release of those in prison for crimes. Thus in *United States v. Poston,* 430 F.2d 706 (6th Cir. 1970), we held that it was prejudicial and reversible error to have introduced evidence before a jury that the defendant was on probation at the time of the alleged offense. See, also, *United States v. Smith,* 403 F.2d 74 (6th Cir. 1968); *United States v. Rudolph,* 403 F.2d 805 (6th Cir. 1968); *United States v. Calvert,* 498 F.2d 409 (6th Cir.

1974); *United States v. Hurst,* 510 F.2d 1035 (6th Cir. 1975); *United States v. Blanton,* 520 F.2d 907 (6th Cir. 1975).

■ The government in its brief, in arguing that defendant Calhoun was not impermissibly denied his right of cross examination, comments:

> Defense counsel had three options: either not questioning; or asking such questions that the defendant's record be revealed; or questioning the parole officer carefully so as to avoid eliciting prejudicial information. Moreover, the trial judge was seeking to protect the defendant, not a witness. It was the defendant's criminal record, not that of the witness, which the court kept from the jury. As to possible bias on the part of the witness, it was the failure of defense to question, not the order of the court, which denied the jury the opportunity to determine if such bias existed. Defendant was not denied the right to effective cross examination, he rejected it. It is clear that defendant was not impermissibly denied his right to cross examination.

This in effect is an argument that Calhoun waived his right to cross examination.

> The question of a waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law. There is a presumption against the waiver of constitutional rights, see, *e. g., Glasser v. United States,* 315 U.S. 60, 70–71, 62 S.Ct. 457, 464–465, 86 L.Ed. 680, and for a waiver to be effective it must be clearly established that there was 'an intentional relinquishment or abandonment of a known right or privilege.' *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461.

> *Brookhart v. Janis,* 384 U.S. 1, 4, 86 S.Ct. 1245, 1247, 16 L.Ed.2d 314

We find it difficult to imply a voluntary waiver by Calhoun where the constitutional pursuit of cross examination would introduce testimony which if procured by the government would constitute reversible error. Waiver cannot exist where the choice given is not real, and amounts to a choice

"between the rock and the whirlpool," *Garrity v. New Jersey,* 385 U.S. 493, 498, 87 S.Ct. 616, 619, 17 L.Ed.2d 562 (1967). In *Garrity* the government sought to introduce certain statements given by police officers during an investigation of their conduct. The statements were given by the officers after being warned that they were subject to dismissal if they refused to answer certain questions on the basis of their Fifth Amendment rights. Holding that "the choice given petitioners was either to forfeit their jobs or to incriminate themselves," 385 U.S. at 497, 87 S.Ct. at 618, the Supreme Court rejected the contention that the officers had, by consenting to make the statement under such circumstances, waived their right against self-incrimination. *See also Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973) holding that a waiver of the privilege against self-incrimination which was secured under the threat of substantial economic sanctions cannot be termed voluntary.

While we need not determine whether the procedure used here was sufficiently coercive to amount to a deprivation of Calhoun's constitutional right to confront witnesses, it clearly appears that his right and interest in uninhibited choice was sufficiently substantial and that the impact of the testimony was of sufficient import to preclude our finding that the court's ruling was harmless error. Fairness and simple justice need not always be measured by a constitutional yardstick. It is enough here, we believe, to hold that the court's failure to exclude Snyder's testimony was an abuse of its discretion and that it affected the substantial rights of Calhoun at the trial.

Reversed and remanded for new trial.