9 F.3d 110
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Carl G. CRITE, Defendant-Appellant.
 No. 92-6015.
 United States Court of Appeals, Sixth Circuit.
 Nov. 2, 1993.
 
 Before: MARTIN and NORRIS, Circuit Judges; and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant-appellant, Carl G. Crite, appeals his conviction and sentence for violating 18 U.S.C. Sec. 2113(a) by robbing two FDIC banks.
 
 I.
 
 2
 At approximately 2:00 p.m., on April 18, 1991, a man entered the Southland Terrace Branch of the Cumberland Bank in Louisville, Kentucky and went to the second teller station, which was being supervised by Linda Fawbush. He shoved a note at her which read in part as follows:
 
 
 3
 I'll kill you first if you try something stupid. Put the money in the bag Hurry
 
 
 4
 The robber then pushed a brown paper bag at her and laid a blue velvet bag on the counter. Fawbush took the paper bag to the nearest teller drawer, the drawer of Sherry Anselmo, removed the money from the drawer, and put it into the bag. Fawbush placed about $1,400 into the robber's bag. She also put bait money into the bag, which triggers the bank's alarm and surveillance camera. The robber took the bag and ran out the front door. Fawbush watched him until he disappeared behind the nearby Post Office. The robber's demand note was left on the counter where it had been laid and Fawbush did not see who picked it up. When the police arrived, they took custody of the demand note. Fawbush described the robber to the police as a black man who was 5' 10" tall, weighed 140 to 145 pounds, and had a small build. She also said he wore dark sunglasses and a white fishing hat pulled down on his head, and that his complexion was clear and well shaved.
 
 
 5
 On April 5, 1991, electrical service was disconnected at the apartment of Jalwynn Easton, defendant's girlfriend. At 4:48 p.m. on April 18, the same day as the Cumberland Bank Robbery, Easton made a $500 payment on her account to have service restored. Easton's apartment was less than a mile from the Cumberland Bank.
 
 
 6
 At trial, Fawbush identified defendant as the robber. An FBI fingerprint specialist also identified two latent prints on the demand note as defendant's. Previously the Louisville police had not been able to identify the latent fingerprints found on the note.
 
 
 7
 At approximately 11:30 a.m., on May 3, 1991, the Woodlawn Branch of the First National Bank was robbed. The robber gave the teller, Marilyn Clark, a roll of quarters and asked that she exchange them for a ten-dollar bill. She asked him for a telephone number which she wrote on the roll. After she opened the cash drawer, the robber placed a note on the counter, which read in part as follows:
 
 
 8
 I'll kill you first if you try something stupid! Put all the money in the bag Hurry[1]
 
 
 9
 The robber then gave her a brown paper bag and placed a dark blue bag on the counter. Mrs. Clark took about $6,000 out of her drawer and placed it in the paper bag along with a dye bomb. The robber then ran from the bank. Joann Davis, the teller next to Clark, immediately looked over at Clark, who was slumped back in a chair and appeared to be in shock.
 
 
 10
 Davis, who had seen the robber for about 5 seconds while he was waiting in line and about 8 to 10 seconds overall, described him to the police as a black male, about 5' 7" tall, 160 pounds, and wearing a hat like a fishing cap and dark glasses. Clark gave a virtually identical description, saying that the robber's complexion was medium to light. At trial, Davis and Clark both identified defendant in court as the robber.
 
 
 11
 The surveillance photos from the first robbery were shown on Crime Stoppers on television. Lisa Quarles, the sister of defendant's girlfriend, identified defendant as the robber to the Louisville Police Department on June 20, 1991 as the person in the surveillance photographs.
 
 
 12
 On June 25, 1991, FBI agents showed the photographs taken by the Cumberland Bank surveillance camera to two of defendant's former employers, Randolph Gray and Duane Wise.[2] After they identified defendant as the robber, an arrest warrant was issued for his arrest and a search warrant for his father's house. The only item seized in the search of defendant's father's house was a pair of sunglasses that appeared to match those in the surveillance photographs.
 
 
 13
 Defendant was arrested on July 6, 1991. On July 9, the Louisville police conducted a lineup. In keeping with the police department's practice, Detective Fitzgerald contacted an officer at the county jail and sought volunteers to appear in the lineup with defendant, asking for black males from 5' 10" to 6 feet in height with thin builds, approximately 30 to 40 years of age, who had long processed hair curl. The jail produced five inmates, who along with defendant, were dressed in bright orange jail coveralls for the lineup. At the request of a lawyer from the local public defender's office who was summoned to the lineup, all the participants in the lineup removed their shoes.
 
 
 14
 The lineup was reviewed by four tellers from the First National Bank--including Marilyn Clark, the victim of the robbery--and a non-victim teller from Cumberland Bank. Clark made a positive identification of defendant, and Joann Davis, another teller at First National, was 80% sure that defendant was the robber. The other witnesses did not make positive identifications of anyone, but tentatively identified other lineup participants as being similar to the robber.
 
 
 15
 On September 3, 1991, defendant was charged in an indictment returned in the United States District Court for the Western District of Kentucky with violating 18 U.S.C. Sec. 2113(a) by robbing two FDIC banks, the first on April 18, 1991 and the second on May 3, 1991.
 
 
 16
 At trial, defendant presented an alibi defense, arguing that he had been mistakenly identified. His father and girl friend testified that he never had any money. A hairdresser said that defendant customarily came to her shop before 12:30 each day to watch a television soap opera and would stay until 2:00 or 3:00 p.m. However, she had no record that he had his hair done on May 3, 1991. Defendant's father said he had left him at home, without a car, on April 18 and May 3. His girl friend said she had spent the afternoon at defendant's house with him on April 18 and May 3, and that he had his hair done on the morning of May 3.
 
 
 17
 Defendant also testified and denied robbing either bank. He claimed that he spent the afternoon of April 18, 1991--the day of the Cumberland Bank robbery--with his girlfriend at his house, and that he arrived at the hairdresser's salon at about noon or 12:30 on May 3, the day of the First National Bank robbery. He contended that someone else was depicted in the surveillance photos from Cumberland Bank, because the robber lacked his prominent Adam's apple. Finally, he claimed that when he was arrested, Detective Fitzgerald handed him the demand note and asked if he had written it.
 
 
 18
 On February 10, 1992, after a five day trial, defendant was convicted on two counts of bank robbery, in violation of 18 U.S.C. 2113(a). He was sentenced to 270 months' imprisonment, to be followed by three years' supervised release. He also was ordered to make restitution to the two banks in the amount of $7,593. This timely appeal followed.
 
 II.
 
 19
 Defendant contends that the district court erred in not suppressing the in-court identification of defendant by Marilyn Clark because her pre-trial identification was the product of a lineup that was impermissibly suggestive. Defendant argues that a composite description of the robber taken from the description given by tellers Linda Fawbush, Joann Davis and Marilyn Clark would be a black man, 5'7"-5'10" tall, about 160 pounds, clean shaven, 25-30 years of age, who had curly hair. He contends that not a single lineup participant came close to matching this description except defendant, relying on People v. Caruso, 68 Cal.2d 183, 188 (1968). He argues that if Marilyn Clark was going to choose anyone in the lineup, defendant was singularly marked for identification.
 
 
 20
 The United States argues that the lineup was not unduly suggestive. Immediately prior to trial, the district court conducted a suppression hearing on the lineup identification. Louisville Police Detective Robert Fitzgerald, who had administered the lineup, testified that it was the police department's common practice to request volunteers from the county jail to participate in lineups. He stated that on the day of the lineup, he called the captain in charge of the county jail and requested participants for the lineup who were black males, 5'10" to 6 feet tall, approximately 30 to 40 years of age, with thin builds and long processed curl style hair. Fitzgerald explained that he tried to get men who matched defendant's appearance at the time rather than persons who might match the robbery witnesses' post-robbery descriptions.
 
 
 21
 The witnesses--four from First National Bank and one from Cumberland Bank--were taken to a room separate from the lineup participants and briefed by Fitzgerald on the procedures for viewing the lineup. They were told that the lineup participants would not be able to see the witnesses. Fitzgerald also told the witnesses that in order to make an identification, they had to be 100 percent certain. He also advised them that tentative identifications would be helpful to the police, but should not be put on the form as an identification. He did not suggest or imply that the suspect was in the lineup or that the witnesses should pick someone even if a witness was not sure of his or her identification.
 
 
 22
 The five witnesses then viewed the lineup separately. Only Marilyn Clark, the victim of the First National Bank robbery, made a positive identification of defendant.
 
 
 23
 After hearing the testimony of Fitzgerald, who acknowledged that there were differences among the men in the lineup, but opined that the lineup was as fair as the police could make it under the circumstances, and after reviewing the videotape of the lineup, the district court denied defendant's motion. The court found that the lineup was procedurally appropriate, observing that it was not until the second time that the camera panned defendant in the videotape that the judge recognized defendant. In a later written ruling, the court credited the testimony of Detective Fitzgerald and the teller Clark, and reiterated that "the Court upon looking at the videotape of the line-up had some difficulty picking out the defendant because of the similarity of the participants in the line-up."
 
 
 24
 The district court did not abuse its discretion in admitting either Clark's identification of defendant at the pretrial lineup or her in-court identification. A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard. Black Law Enf. Officers Ass'n v. City of Akron, 824 F.2d 475, 479 (6th Cir.1987) (quoting Christian Schmidt Brewing Co. v. G. Heileman Brewing Co., 753 F.2d 1354, 1356 (6th Cir.), cert. dismissed, 469 U.S. 1200 (1985)); accord Fleischut v. Nixon Detroit Diesel, Inc., 859 F.2d 26, 30 (6th Cir.1988). A defendant bears the burden of showing that a pretrial identification was impermissibly suggestive. United States v. Hill, 967 F.2d 226, 230 (6th Cir.), cert. denied, 113 S.Ct. 438 (1992). In the present case, defendant simply argues that he was the only person in the lineup who was similar to the description given by the witnesses at the two bank robberies. Detective Fitzgerald, however, said that he tried to be fair by seeking men who were similar to defendant in appearance rather than people who matched the earlier descriptions of the witnesses. The district court, after viewing the videotape and the still photographs of the lineup, found that the lineup was not suggestive, but instead that the participants in the lineup were so similar that the court had difficulty picking defendant out of the lineup. Defendant has offered nothing to undercut this factual finding, which we may reverse only if it is clearly erroneous. Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985). Moreover, the fact that only one witness positively identified defendant while three other witnesses tentatively identified others in the lineup shows that the lineup was not unduly suggestive. Because the district court did not rely on clearly erroneous facts in determining the lineup was not suggestive, the court did not abuse its discretion in admitting Clark's identification of defendant. The district court is affirmed on this issue.
 
 III.
 
 25
 Defendant contends that the district court abused its discretion in admitting fingerprint evidence because the chain of custody had been broken.[3] At trial, defendant claimed that after his arrest, Detective Fitzgerald handed him the demand note from the Cumberland Bank robbery and asked him if he had written it. Defendant contends that his fingerprints were placed on the demand note when he was interrogated by the police, not at the time of the robbery. Defendant argues that at the robbery, the note was left on the counter where it was laid and the teller, Fawbush, did not see who picked it up, and that the Louisville police were unable to find any prints on the note which it could use to identify the robber. Defendant contends that there was no testimony from the Louisville Police Department about who had custody of the note or when it was removed from the evidence room for fingerprint analysis. He argues that his statement that the note was handed to him at the interrogation was not rebutted in any way and that because the Louisville police did not find defendant's fingerprints on the note, it must be assumed that they were placed on the note after the robbery. Defendant contends that there was a gap in the chain of custody from the day of the robbery, April 18, 1991 until December 2, 1991 when the note was received by the F.B.I. Therefore, defendant concludes the district court abused its discretion in admitting the fingerprint evidence (the testimony of Kenneth Dunn, the FBI fingerprint expert, that he received the note in Washington, D.C. and located one or two of Crite's prints on it). Defendant argues that the government failed in its burden of proof that the physical exhibit being offered was in substantially the same condition as when the crime was committed because of the gap in the chain of custody. United States v. Jones, 486 F.2d 476 (1973), cert. denied, 415 U.S. 917 (1974).
 
 
 26
 The United States argues that "challenges to the chain of custody go to the weight of the evidence, not its admissibility." United States v. Levy, 904 F.2d 1026, 1030 (6th Cir.1990), cert. denied, 498 U.S. 1091 (1991). The government contends that it produced sufficient evidence about the chain of custody on the note. First, Linda Fawbush, the teller who had received the note, identified it as the one she was given during the robbery. Louisville Police Detective Aaron Graham testified that the normal practice of the police department was to have all evidence handled by evidence technicians, who would take the evidence to their office, log it in, and turn it over to the property room attendants. Evidence is kept in the property room until it is released by the police department. Graham also said that the note, exhibit GX 3, was gathered at the scene and safeguarded in keeping with the department's routine practice. According to Detective Graham, at no time after the robbery could defendant have touched the note once it was in the possession of the police department.
 
 
 27
 In October 1991, the police forwarded the demand note to FBI Agent Deirdre Fike, who then sent it to FBI headquarters for analysis. FBI agent Deirdre Fike testified that the note had been taken into custody by the Louisville Police Department at the time of the robbery and remained there until October 1991, when the note was forwarded to the FBI for analysis. The United States argues that the district court did not have to credit defendant's claim that Detective Fitzgerald showed him the actual note, rather than a copy, during interrogation and was justified in relying on Detective Graham's testimony that the note was safeguarded according to the customary practice of the police department and that defendant could not have touched the note once it was in the possession of the police department.
 
 
 28
 We agree. In United States v. Lott, 854 F.2d 244 (7th Cir.1988), the defendant objected that the government failed to show a complete chain of custody because there was no testimony concerning the transfer of fingerprint exhibits from the DEA field office to the DEA laboratory or FBI laboratory for fingerprint analysis. The Lott court found that the missing links were minor and that in any event:
 
 
 29
 the government need not prove a perfect chain of custody for evidence to be admitted at trial.... [T]he government need only show that it took reasonable precautions to preserve the original condition of the evidence, it does not have to exclude all possibilities of tampering with the evidence. In addition, a presumption of regularity exists with respect to official acts of public officers and, absent any evidence to the contrary, the court presumes that their official duties have been discharged properly.
 
 
 30
 Id. at 250 (citations omitted). Therefore, the court in Lott held that the fingerprint evidence was admissible.
 
 
 31
 The same is true in the present case. The district court was satisfied that the government established a sufficient foundation for admission of the note. On this record, we cannot conclude that it abused its discretion in reaching this conclusion. United States v. Aviles, 623 F.2d 1192, 1197 (7th Cir.1980). The chain of custody for the exhibit was substantially complete and the trial court could properly conclude, taking into account the lack of evidence of any government wrongdoing along with the presumption that the government's agents correctly performed their duties, that the evidence was admissible.
 
 
 32
 In United States v. Henderson, 588 F.2d 157 (5th Cir.), cert. denied, 440 U.S. 975 (1979), the defendant made a similar argument to the one defendant makes in the present case and challenged the admission of evidence establishing that his fingerprints were found on an incriminating check. The defendant in Henderson argued that the government did not offer any evidence indicating that his fingerprint was not affixed to the check at a time unrelated to guilt or innocence. The Henderson court rejected this argument because there was direct testimony that the defendant handled the check during the commission of the crime and whether the government has proved an adequate chain of custody goes to the weight rather than the admissibility of the evidence. Id. at 160. Similarly, in the present case there was direct testimony that defendant handled the note during the commission of the crime. See also United States v. McFadden, 458 F.2d 440 (6th Cir.1972), cert. denied, 410 U.S. 911 (1973). (Where one of the bank tellers identified note purportedly used by robber and possession of note was accounted for except for very brief interval between robbery and arrival of police, the note which contained fingerprints matching those of defendant was admissible since the possibilities of misidentification by alteration had been eliminated as a matter of reasonable probability); United States v. Bizzard, 674 F.2d 1382, 1388 (11th Cir.), cert. denied, 459 U.S. 973 (1982), (defendant's contention that the unexplained four-week period between the time fingerprints were taken from the bank and the time they arrived in the FBI laboratory in Washington go not to the admissibility of the evidence but to the weight to be accorded by the jury to the sufficiency of proof of chain of custody); United States v. Weeks, 645 F.2d 658, 660 (8th Cir.1981) (despite contention that prosecution failed to establish sufficient chain of custody for the purchase order, the district court did not err in admitting it into evidence based on testimony that seller put order into his files where it remained until he gave it to FBI agent and that no one else touched order prior to time it was given to agent, and testimony of agent that he was in possession of purchase order until he sent it to an FBI laboratory to be checked for fingerprints).
 
 
 33
 In the present case, matters relating to the chain of possession of the note from the Louisville police to the FBI relate only to the weight to be given to the testimony of defendant as opposed to officer Graham and FBI agent Fike about custody of the note. In the final analysis, the verdict depended on whether the jury believed the United States or the defendant. This matter of credibility is for the jury, not the appellant court. United States v. Coffman, 638 F.2d 192, 196 (10th Cir.1980), cert. denied, 451 U.S. 917 (1981); United States v. Robinson, 967 F.2d 287, 292 (9th Cir.1992). See also United States v. Clark, 425 F.2d 827, 833 (3rd Cir.), cert. denied, 400 U.S. 820 (1970) ("While it is true that an object connected with a crime must be shown to be in substantially the same condition as when the crime was committed before it can be admitted, the objections which the defendant here makes go to the weight of the evidence rather than to its admissibility and, hence, the question was properly left to the jury").
 
 
 34
 To conclude, in the present case, the district court was entitled to assume that the public officials having custody of the note properly discharged their duties and did not tamper with it. Where the trial judge, upon consideration of these factors, is satisfied that in reasonable probability the article has not been changed in any significant respect, he may permit its introduction into evidence. United States v. Malone, 558 F.2d 435, 438 (8th Cir.1977); Weeks, 645 F.2d at 660. In the present case, we find no error in the proceedings of the district court. Therefore, the district court is affirmed on this issue.
 
 IV.
 
 35
 Defendant contends that the district court abused its discretion by allowing two lay witnesses, defendant's former employers, Randolf Gray and Duane Wise, to testify that the person in the surveillance picture was Carl Crite. Although the prosecutor stated that the lay witnesses would have "additional evidence" they would testify to, defendant contends that this was a smoke screen by the prosecution because the purported additional evidence about defendant's employment had no relevance to the robberies and it was the provence of the jury to review the photos and videotapes and decide for themselves if the robber was defendant. Defendant maintains that the only purposes of the two employers in testifying was to identify the person in the surveillance photo and their testimony was prejudicial and reversible error as was the case in United States v. Calhoun, 544 F.2d 291 (6th Cir.1976).
 
 
 36
 The United States contends that Calhoun is distinguishable. In Calhoun, the government called the defendant's parole officer for the sole purpose of identifying him from a photograph. In order to attack the witness's credibility, the defendant would have had to reveal that the witness was his parole officer, thereby allowing the jury to infer that the defendant had a prior criminal record. The Calhoun court held that, because of the defendant's relationship with the witness, the defendant was improperly denied the right to cross examine the witness. 544 F.2d at 293-96.
 
 
 37
 The government argues that although the court suggested in Calhoun that lay witness identification generally was unnecessary because a jury can judge for itself whether the defendant is the person in a photograph, 544 F.2d at 295, in United States v. Monsour, 893 F.2d 126 (6th Cir.1990), this court distinguished that observation, saying that it was not the basis for the Calhoun decision. 893 F.2d at 128. This court in Monsour went on to affirm the admission of a bank security guard's testimony that the defendant was the person in a surveillance photograph whom the guard had seen "casing" the bank eight days before the bank robbery. Id. at 128-29. This court stated that identification testimony was relevant and not prejudicial, because it was part of the investigation that led the FBI to the defendant. Id. at 129.
 
 
 38
 We agree with the United States that the present case is governed by Monsour, not Calhoun. As in Monsour, Gray's and Wise's (the two employers) identifications were part of the investigation that led the police and FBI to seek an arrest warrant for defendant and to search his home. Consequently, the district court did not err in admitting the testimony of Gray and Wise.
 
 
 39
 In regard to Calhoun's dicta that the only reason for the testimony was the identification, in the present case both Gray and Wise testified that defendant's employment ended before the first robbery and Wise made clear that defendant received his last paycheck from Kroger well before the Cumberland Bank robbery. That evidence served to negate any possible claim that defendant had had another source for the $500 that his girlfriend used to pay her electric bill the day of the Cumberland Bank robbery. For this reason, even under Calhoun's dicta, the district court properly admitted the two witnesses' testimony and is affirmed on this issue.
 
 V.
 
 40
 Defendant argues that the district court should have sentenced him to 210 months imprisonment instead of the 270 months in prison that the district court imposed. However, defendant gives no reason for his assertion that the district court erred in calculating his sentence and makes no citation to authority.
 
 
 41
 Fed.R.App.P. 28(a) requires a party to state in his brief the factual and legal bases for his claims with appropriate "citations to the authorities, ... and parts of the record relied on." Defendant has not complied with this rule. For this reason, he has waived his right to assert a sentencing error. United States v. Church, 955 F.2d 688, 690 n. 1 (11th Cir.), cert. denied, 113 S.Ct. 233 (1992); United States v. Papia, 910 F.2d 1357, 1363 (7th Cir.1990); United States v. White, 879 F.2d 1509, 1513 (7th Cir.1989), cert. denied, 494 U.S. 1027 (1990); Northwest Acceptance Corp. v. Lynnwood Equipment, Inc., 841 F.2d 918, 923 (9th Cir.1988).
 
 VI.
 
 42
 To conclude, the decision of the district court is hereby AFFIRMED.
 
 
 
 [1]
 This note was also taken into police custody, but no identifiable fingerprints could be found on it
 
 
 [2]
 In May 1991, Detective Fitzgerald interviewed Duane Leonard, who identified the man in the surveillance photo as John Pitts. Fitzgerald investigated Pitts, but concluded he had not committed the Cumberland Bank robbery
 
 
 [3]
 This claim pertains to count one of the indictment only, which charged defendant with violating 18 U.S.C. Sec. 2113(a) by robbing the Cumberland Federal Savings Bank on April 18, 1991. The contested fingerprint evidence involved the demand note used at the Cumberland robbery. The gap in the chain of custody does not pertain to count two, charging defendant with violating 18 U.S.C. Sec. 2113(a) by robbing the First National Bank of Louisville on May 3, 1991. Defendant was sentenced to a term of 270 months imprisonment as to each count of the indictment with each term to be served concurrently