NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0608n.06

Case No. 16-6821

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Nov 03, 2017
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA, )
)
    Plaintiff - Appellee, )
)
v. )
) ON APPEAL FROM THE UNITED
JESCELL WHITTLE, ) STATES DISTRICT COURT FOR
) THE WESTERN DISTRICT OF
    Defendant - Appellant. ) KENTUCKY
)

BEFORE: GIBBONS, COOK, and THAPAR, Circuit Judges.

COOK, Circuit Judge. A jury convicted Jescell Whittle of attempted armed robbery of a Cricket Wireless store and of the armed robbery of a Speedway gas station convenience store. Whittle appeals his convictions and seeks a new trial, alleging numerous errors by the district court.

Finding no merit in his contentions, we AFFIRM his convictions.

## I. BACKGROUND

### A. The Robberies

In late 2012, a string of robberies and attempted robberies afflicted Louisville, Kentucky. A Cricket Wireless store was robbed on October 22, followed by an attempted robbery of a second Cricket Wireless store the next day. On October 29, a J.C. Cigarette Outlet store was robbed, as was a Thornton's convenience store a day later. Then, early in the morning on October 31, a group of men robbed a Speedway gas station convenience store, taking

approximately $450 in cash and shooting a bystander. Surveillance cameras at each location captured the incidents.

The Louisville Metro Police Department ("LMPD") internally distributed a series of still images taken from the surveillance footage of each robbery. Reviewing the stills, Officer Andre Shaw recognized Jescell Whittle as one of the men who attempted to rob the Cricket Wireless store on October 23. Shaw knew Whittle's face well; when he was an officer in the Kentucky Department of Juvenile Justice, Shaw supervised a then-teenaged Whittle around 2004 or 2005 and saw him five to six days per week, for eight to ten hours per day. Shaw testified that he had seen Whittle a couple of times since then, most recently while patrolling a Louisville street in "[r]oughly 2011 or 2012."

LMPD Detective Tim Crowell showed Justin Durbin, a Speedway robbery victim, photos of six men. After Crowell made some introductory remarks and provided instructions, Durbin identified Whittle as the robber who shot another customer. Durbin later confirmed his identification at trial.

## B. Arrest and Interrogation

LMPD officers arrested Whittle on November 8, 2012. Whittle had conversations with four different detectives that day. Before the first interview, the detectives read Whittle his *Miranda* rights, and Whittle signed a written waiver of those rights. First, Detective Larry Smith and Detective Crowell interviewed Whittle for about forty-five minutes to an hour, during which Whittle denied any knowledge of or involvement in the robberies. Recognizing that they were not making any headway with Whittle, Smith and Crowell suspended the interview and went down the hall to interview Tony Trumbo, another suspect in the Speedway and Cricket robberies who had also been arrested that day.

Crowell left Whittle in the care of Detective Larry Clark, who checked in on Whittle every fifteen to twenty minutes. Crowell never asked Clark to interview Whittle; however, on the third or fourth check-in, Whittle asked Clark if they could talk about his arrest. Unprompted, Whittle told Clark that he could not have perpetrated the October 23 Cricket robbery because he had been at work. Clark then took steps to confirm this alibi—calling Whittle's employer, obtaining a waiver from Whittle for the release of his employment records, and traveling to his employer's location.

Before Clark left LMPD headquarters, he asked another detective, Aleasha Rhudy, to take over supervising Whittle. Like Clark, Rhudy made herself available to Whittle in case he needed food, drink, or a trip to the restroom. As with Clark, nobody asked Rhudy to interview Whittle. Some time later, Whittle called for Rhudy and asked her how long Clark would be away confirming his alibi. Rhudy could not give him a good estimate, and Whittle responded by saying something along the lines of "[i]t probably doesn't matter anyway." This spurred a conversation between Whittle and Rhudy, with Whittle describing aspects of his troubled upbringing. Rhudy steered the discussion back toward the robberies, but Whittle hesitated, not wanting to become a "snitch." Rhudy then left for a moment to use the bathroom, at which point she encountered an officer (she could not recall precisely who) involved in the Trumbo interview underway down the hall. Apparently, Trumbo was "telling [the police] everything that happened," confessing to his involvement in the robberies.

Returning to Whittle, Rhudy told him that he need not worry about being a snitch because Trumbo was down the hall telling the whole story to the police. Rhudy made it clear that she did not think Whittle was a violent criminal out to hurt people intentionally. They then reviewed surveillance photographs from the robberies; when they came to photographs of the Speedway

robbery, Whittle's demeanor changed. When he expressed remorse that anyone was harmed in the robbery, Rhudy prompted him "to get your side of the story out because you don't want to go into this with only Mr. Trumbo's side of the story being told . . . ." Whittle eventually confessed his involvement in the Speedway robbery. He also confessed to participating in the October 23 Cricket robbery.

Up to this point, Rhudy hadn't recorded her conversation with Whittle. Rhudy asked Whittle if he would "like the opportunity to tell his side of the story on tape." When Whittle said yes, Rhudy retrieved a tape recorder and conducted a second interview (this one recorded) regarding the Cricket and Speedway robberies, during which they once again reviewed surveillance photographs.

Police later obtained warrants to search both Trumbo's and Whittle's homes, where they found evidence including clothing used in the robberies as well as .22 and 9mm bullets, the same caliber as guns suspected of being used in the robberies.

### C. Indictment and Trial

A grand jury indicted Whittle and several others on ten counts, including robbery, attempted robbery, and the use, carrying, brandishing, and discharging of a firearm during a crime of violence. Specifically, the indictment charged Whittle with the Cricket Wireless robberies, the robberies of the J.C. Cigarette Outlet and the Thornton's convenience store, and the Speedway robbery, with concomitant firearms charges for each robbery.

A jury acquitted Whittle of some charges, but found him guilty of the October 23 Cricket Wireless attempted robbery, the Speedway robbery, and the accompanying firearms violations. In total, the district court sentenced him to 444 months' imprisonment. This timely appeal raising five issues followed.

The government had a strong case against Whittle, with his recorded confession, surveillance footage that captured his face, and victim-eyewitness identification. He defended by seeking to suppress the confession based on alleged police coercion, and by raising constitutionally based evidentiary challenges to his conviction. Agreeing with the decisions by the district court on each challenge, we affirm Whittle's convictions.

## II. HEARSAY AND CONFRONTATION CLAUSE ISSUES

Whittle first argues that the district court violated his Sixth Amendment Confrontation Clause rights by admitting six hearsay statements without proper limiting instructions. We review these challenges de novo. *United States v. Vasilakos*, 508 F.3d 401, 406 (6th Cir. 2007).

### A. Statements Involving Tony Trumbo

Several of Whittle's hearsay objections concern witnesses at his trial testifying to information gleaned from Tony Trumbo, a cohort arrested the same day as Whittle under suspicion of participation in the same robberies.

#### 1. Detective Bell's Testimony

The first Trumbo-related objection came when the government asked Detective Sean Bell, on direct examination, why the police searched Trumbo's house. Bell replied, "[w]e had information from Mr. Trumbo that [Whittle] had sometimes stayed at his residence." Whittle's counsel objected on hearsay grounds, which the court overruled.

Only those out-of-court statements offered to prove the truth of the matter asserted are inadmissible hearsay (subject to exceptions not at issue here). Fed. R. Evid. 801(c). The district court correctly decided that this statement was not hearsay as it was not offered to prove that Whittle stayed at Trumbo's house, but rather to explain why the police thought they could find evidence of Whittle's guilt there. The testimony provided background to the police investigation

with no effect on Whittle's rights. *See United States v. Martin*, 897 F.2d 1368, 1372 (6th Cir. 1990) ("The assertions in this case were not offered for their content; therefore, there was no need to test the credibility of the out of court declarant as to their substance.").

*2. Detective Rhudy's Remarks on the Confession Tape*

Similarly, the jury heard the confession tape capturing Rhudy's comments that Trumbo identified Whittle as one of the three individuals pictured in the surveillance footage of the robberies.

The district court held each of Rhudy's interjections referring to another declarant as admissible non-hearsay because each was not offered to prove that Whittle committed the alleged crimes. We agree with the district court that the statements were admissible to rebut Whittle's claim that his confession was coerced.

A major thrust of Whittle's defense was his effort first to prevent, through a motion to suppress, the jury from learning about his confession. Failing at that—the court denied the motion—Whittle argued to the jury that his confession was the product of police coercion through use of unsavory interrogation techniques, and thus false. Whittle offered the testimony of a psychologist to support his stance that defendants with similar personal characteristics can fall prey to interrogation tactics conducive to eliciting coerced, false confessions.

As the government argues, the aspects of the tape with Rhudy's interjections mattered because without them, the jury would be left with an incomplete picture of the interaction between Rhudy and Whittle. Whittle's coercion defense depended on portraying Rhudy as using Trumbo's circumstances down the hall to unfairly mislead or trick Whittle into falsely confessing.

Because Whittle defended on the ground that his confession was coerced and false, the district court properly permitted the government to present evidence to challenge that defense. *See Tennessee v. Street*, 471 U.S. 409, 415 (1985) (holding that preventing the prosecution from rebutting a defendant's charge of a coerced confession "would [be] at odds with the Confrontation Clause's very mission"). The playing of the full, uncensored confession tape, with its references to cohort Trumbo's statements to other officers, allowed the jury to assess unlawfulness in Rhudy's methods.

### 3. Lack of Limiting Instructions

Whittle stresses the absence of any limiting instructions to the jury in connection with these various remarks. The question before us is whether the failure to offer such instructions warrants reversal.

Similar cases emphasize limiting instructions' benefit in explaining how to assess out-of-court statements by non-party co-conspirators. *See, e.g.*, *Street*, 471 U.S. at 414–15; *Adamson v. Cathel*, 633 F.3d 248, 258 n.8 (3d Cir. 2011) (characterizing *Street* as requiring a limiting instruction where "nonhearsay use is made of expressly incriminating statements"); *Jones v. Basinger*, 635 F.3d 1030, 1050–51 (7th Cir. 2011) (same). Indeed, as Whittle notes, even the cases that the district court cited in its decision denying Whittle's motion for a new trial highlight the importance of limiting instructions. *See, e.g.*, *United States v. Cruz-Diaz*, 550 F.3d 169, 179 (1st Cir. 2008); *Andrade v. Martuscello*, No. 12 Civ. 6399, 2013 WL 2372270, at *10 (S.D.N.Y. June 3, 2013) (magistrate's report and recommendation), *adopted in full*, 2015 WL 4154108 (S.D.N.Y. July 9, 2015). We agree with the numerous other courts to have considered the issue: where a non-testifying person's out-of-court statements incriminating the accused are admitted

for a non-hearsay purpose, the court should give clear limiting instructions to the jury to prevent misuse of the evidence.

Whittle's counsel never requested a limiting instruction, either at the time the tape was played or when the judge delivered final instructions. The government argues that this failure limits our role to plain error review. Whittle responds that because the government itself invoked Federal Rule of Evidence 105—which governs requests for limiting instructions and does not specify that a request for a limiting instruction must come from a defendant—this court should consider the request as made. Fed. R. Evid. 105 ("If the court admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly."). When Whittle's counsel objected to the admission of Tony Trumbo's statements as relayed by Rhudy's interjections on the confession tape, the Assistant U.S. Attorney told the district court that "[t]he United States believes it would be appropriate if the Court were to admonish the jury that the other statements aren't what you are to hear as evidence, but it's Mr. Whittle's statements and his responses to those." The court replied "[o]kay," but then never gave the instruction.

Upon request, the court must provide a limiting instruction. Fed. R. Evid. 105; *United States v. Fraser*, 448 F.3d 833, 839 n.3 (6th Cir. 2006). Failure to give the limiting instruction here, Whittle agrees, is reviewed for harmless error. *Cf. United States v. Chance*, 306 F.3d 356, 388–89 (6th Cir. 2002) (finding harmless error where district court provided generalized limiting instruction in final charge to jury); *United States v. Latouf*, 132 F.3d 320, 329 (6th Cir. 1997) (finding harmless error where the district court provided a limiting instruction two days after introduction of evidence). To show that the error was harmless, the government must establish

beyond a reasonable doubt that the error had no effect on the verdict. *United States v. Willoughby*, 742 F.3d 229, 235 (6th Cir. 2014).

Even assuming that the Assistant U.S. Attorney's remark to the district judge qualified as a "request" under Rule 105, the district court's failure to instruct was harmless. As the district court saw it, these statements were "minimally relevant to the prosecution's case." Only one of Rhudy's various references to Trumbo's alleged statements arguably implicated Whittle. And the government never highlighted the point by either cross-examining Rhudy about Trumbo's statements or arguing their importance to the jury. The defense objected to the issue mainly on the coercion point, not as regards its incriminating value.

Given the expansiveness and strength of the government's overall case, with its circumstantial, testimonial, and physical evidence, we, like the district court, are confident beyond a reasonable doubt that the jury would have reached the same verdicts had the district judge given limiting instructions or played a redacted tape.[1]

### B. Other Alleged Hearsay and Constitutional Violations

In addition, Whittle alleges that the district court admitted hearsay testimony when Detective Crowell testified that police partly relied on "discussions with other suspects" to link a .22 caliber round found in a storage closet in Whittle's residence to Whittle's use of a .22 caliber weapon during the Speedway robbery. Crowell also testified that some of Whittle's statements to Detective Rhudy linked him to the bullets.

Here too the detective's testimony explained only why the police found the presence of a .22 caliber round where the suspect lived significant. Because the testimony was not offered to

---

[1] Whittle also argues that the lack of limiting instructions following Bell's and Crowell's statements on direct examination, discussed in Parts II.A.1 and II.B of this opinion, respectively, warrant reversal. Yet any error here was harmless. In addition to playing a minor role in the government's case, the statements were cumulative and corroborated by other evidence, as they accompanied physical evidence and information from Whittle's own confession. Plus, the court permitted Whittle extensive cross-examination of both detectives.

prove that Whittle wielded that caliber weapon, it was not hearsay and did not infringe Whittle's confrontation rights. *Martin*, 897 F.2d at 1372.

Last, Whittle complains about alleged hearsay in Rhudy's testimony on direct. His counsel did not object to this alleged hearsay at trial. We thus review for plain error. *United States v. Goins*, 186 F. App'x 586, 588 (6th Cir. 2006). Seeing no clear or obvious error affecting Whittle's substantial rights or the fairness of his trial, we will not disturb its admission. *See id.*

### III. ISSUES SURROUNDING THE ADMISSION OF WHITTLE'S CONFESSION

Whittle next raises two issues regarding the admission of his confession.

### A. The District Court's Voluntariness Determination Under 18 U.S.C. § 3501(a)

Whittle argues that the district court failed to determine the voluntariness of his confession before allowing the jury to hear it, in violation of 18 U.S.C. § 3501(a), which provides "[b]efore [a] confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness." Typically, a defendant must object to the admission of a confession on voluntariness grounds, lest he forfeit his right to a voluntariness inquiry. *United States v. Bentley*, 726 F.2d 1124, 1128 (6th Cir. 1984); *see also United States v. Stevens*, 445 F.2d 304, 305 (6th Cir. 1971) (per curiam) ("[A] hearing [pursuant to 18 U.S.C. § 3501(a)] is required only if the issue of voluntariness is raised.").

Whittle moved to suppress his confession as given without a knowing and voluntary waiver of his *Miranda* rights. A magistrate judge considered and rejected this argument, finding "upon the great weight of the contrary testimony taken at [a] multi-day-long suppression hearing" that Whittle waived his *Miranda* rights knowingly and voluntarily. The district court

adopted the magistrate's recommendation. Thus, the district court fulfilled its obligations under § 3501(a).

Whittle urges that the voluntariness of his confession is distinct from the voluntariness of his *Miranda* waiver. But he never raised that point before the district court, and therefore forfeited it.

### B. Whittle's Fifth Amendment Right Against Self-Incrimination

Whittle also invokes his Fifth Amendment right against self-incrimination on the rationale that the district court improperly considered the fact that Whittle did not contest the validity of his written *Miranda* waiver until nearly two years after his indictment. Yet because Whittle did not include any of these arguments in his objections to the magistrate's report and recommendation, he forfeited them. *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

### IV. EYEWITNESS IDENTIFICATIONS ISSUES

Whittle next argues that the district court erred in admitting unreliable identifications by Justin Durbin, a witness to the Speedway robbery. Whittle claims a violation of his due process rights because the police unfairly influenced Durbin to select him from a photo lineup. He further argues that the government unfairly refreshed Durbin to prepare him to testify at trial.

Though the parties disagree on the applicable standard of review, even under Whittle's preferred de novo standard, we determine that he has not demonstrated that the identification procedure used was impermissibly suggestive. *See United States v. Meyer*, 359 F.3d 820, 824 (6th Cir. 2004) ("[T]he defendant bears the burden of proving that the identification procedure was impermissibly suggestive.").

Whittle argues that Crowell improperly influenced Durbin to identify Whittle as the perpetrator. We disagree. The record shows that Crowell remained neutral before Durbin made

his identification. Durbin identified Whittle on his own. Only *after* Durbin identified Whittle as a person involved in the robbery did Crowell ask several follow-up questions to confirm that Durbin was flagging Whittle's photo as that of the perpetrator—Crowell never suggested that Durbin had selected the "right" photograph. Furthermore, Crowell instructed Durbin to initial a box marked "I have made an identification" on the identification form *after* Durbin made his identification.[2] Whittle has not shown grounds for this court to label the photo identification as unduly suggestive.

Whittle also claims that the government unfairly steered Durbin toward identifying him at trial. In support he cites the government's playing the surveillance tape and the recording of Durbin's prior identification session as well as having Durbin review the photo array from when he selected Whittle with Whittle's photograph still circled. Because this prepping of Durbin for his testimony took place some four years after Durbin's initial identification, we reject Whittle's impermissible influence label. The government's preparation for trial included refreshing its witness's stale recollection. We see no grounds for reversal on this point.

## V. OFFICER SHAW'S TESTIMONY AND JUDICIAL NOTICE

Next, Whittle challenges the admission of Officer Shaw's trial testimony identifying Whittle in photos of the Cricket Wireless attempted robbery.[3] Shaw testified to spending extensive time with Whittle years earlier.[4] He also testified that he saw Whittle on the street in Louisville "[m]aybe six months to a year" before Whittle's arrest. When asked if his encounter with Whittle "was at least six months before he was arrested," Shaw replied that he "ha[d] no

---

[2] Durbin could have initialed another option on the form, which stated "Photo Number __ closely resembles the suspect but I cannot make a positive identification."

[3] Shaw did not testify concerning the Speedway robbery.

[4] The fact that Shaw had been a juvenile detention officer was not revealed at trial.

idea of that. All I know is when I saw him, he had not changed. I'm certain of that, who it was. I saw him then. I was certain of it."

Two days later, during a break in the trial, defense counsel provided the district court with a certified record from the Jefferson County Jail showing that Whittle was incarcerated during the time period Shaw referenced. Whittle's counsel obtained the record only the day before, and the conversation during the break was the first time the court or the government heard of it. Whittle's counsel viewed this evidence as contradicting Shaw's identification, but he hesitated to introduce it for fear of prejudicing the jury with evidence of Whittle's prior jail time. Instead, Whittle's counsel asked the district court to take judicial notice of the record and to instruct the jury as follows: "You heard testimony that Andre Shaw's best estimate of when he saw Jescell Whittle in the West End of Louisville was six to 12 months before he was arrested. You are instructed that that cannot be true." Alternatively, Whittle's counsel suggested the court instruct that "[Whittle] could not have been on the streets in the West End of Louisville from six to 12 months before." The government objected to the proposed instructions, and the court decided that either instruction would be an inappropriate use of judicial notice. The judge told Whittle's counsel that the incarceration record "may just be that kind of evidence that you are going to have to make a decision about, whether it means that much to your case to show that."

Whittle argues this was error. He points to Federal Rule of Evidence 201, which governs judicial notice of "adjudicative fact[s]" that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(a), (b)(2). Further, he presses that a court "*must* take judicial notice if a party requests it and the court is supplied with the necessary information." *Id.* at 201(c)(2) (emphasis added). Whittle contends

that the district court was obligated to take notice of the proffered records and instruct the jury accordingly.

Ordinarily, we review evidentiary rulings for abuse of discretion. *United States v. Lawrence*, 735 F.3d 385, 405 (6th Cir. 2013). Whittle argues that the district court's decision should instead be considered de novo, as it impacted his constitutional confrontation rights. *See Lawrence*, 735 F.3d at 405 ("Constitutional challenges and questions of statutory interpretation are reviewed de novo."). He relies on *United States v. Calhoun*, where we found a district court abused its discretion when it allowed a defendant's parole officer to testify even though the defendant had no effective means of cross-examining the officer without divulging that he had been on parole and had been convicted of a felony. 544 F.2d 291, 294–97 (6th Cir. 1976). Whittle argues that he faced a similar quandary, claiming the district court's refusal to take judicial notice of his incarceration record effectively deprived him of the ability to challenge Shaw's testimony on this point.

"Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Whittle's reliance on *Calhoun* is misplaced. There, the defense raised an objection to the witness's anticipated testimony before the witness took the stand. *Calhoun*, 544 F.2d at 293. Here, Whittle failed to raise the issue of his prior incarceration before or during Shaw's testimony at trial. Whittle had the opportunity to cross-examine Shaw two days before his counsel asked the district court to take judicial notice of his incarceration records. Two weeks before the trial began, Shaw testified at a suppression hearing that he saw Whittle on the street in Louisville "probably around 2011, 2012, sometime while I was working patrol in the West End." Hence,

Whittle had reasonable pre-trial notice that Shaw believed he saw Whittle when Whittle was incarcerated.

Notwithstanding two weeks' warning and opportunity to obtain the incarceration records, Whittle sprung the matter on the court and the government two days *after* Shaw testified. Whittle may have been able to cross-examine Shaw on this issue in some way that would have avoided letting the jury know Whittle served time, but he made no effort to do so. Thus, Whittle's confrontation rights are not at issue, and the question before us is whether the district court abused its discretion in refusing to grant Whittle's request for judicial notice.

The district court properly refused Whittle's request. Whittle attempted to use judicial notice as a vehicle to enjoy the benefits, but avoid the burdens, of a piece of evidence. But Whittle cites no cases to support the unusual proposition that judicial notice can be used in this way. As the district court noted, ordinarily a defendant simply has to decide if the value of such evidence outweighs the risk of prejudicing himself.

We agree with the government that, had the court granted Whittle's request, jurors would likely have been left with the strong impression that the judge was telling them that Shaw's testimony was not credible, despite the fact that credibility assessments are the special province of the jury. *Blackston v. Rapelje*, 780 F.3d 340, 357 (6th Cir. 2015). Moreover, Whittle's incarceration records do not conclusively torpedo Shaw's credibility. Shaw's recollection of *when* he saw Whittle on the street was fuzzy. He admitted that it was possible he had seen Whittle less than six months before Whittle's arrest. All he was certain of was that he *did* encounter him.

Whittle also objects to Shaw's trial testimony on Federal Rule of Evidence 701 grounds. Under Rule 701, non-expert witnesses may only testify as to opinions that are 1) "rationally

based on the witness's perception"; 2) "helpful to clearly understanding the witness's testimony or to determining a fact in issue"; and 3) "not based on scientific, technical, or other specialized knowledge . . . ." Fed. R. Evid. 701. Whittle claims that the incarceration records undercut Shaw's reliability as a lay witness, and he therefore should not have been allowed to testify under Rule 701. As just discussed, however, even considering Whittle's incarceration records, Shaw offered testimony rationally based on his perceptions and helpful to the jury.

## VI. PHOTOGRAPHS OF 9MM BULLETS

Finally, Whittle asserts that the district court abused its discretion when it admitted, over his objection, two photographs of 9mm bullets recovered from his home. Citing no authority, Whittle claims these photographs had no probative value and only served to prejudicially associate him with 9mm bullets, implicitly portraying him as a criminal. Though Whittle quibbles with the room from which the officers took the bullets, he lived in the house. The government replies that the evidence was probative because surveillance images appear to show one of the other Speedway robbers carrying a 9mm gun.

We agree with the district court that the photographs had at least some probative value not substantially outweighed by any potential prejudice. *See* Fed. R. Evid. 403. They provided a circumstantial link between Whittle and one of the guns possibly used in the Speedway robbery. Detective Crowell's testimony informed the jury that photographs showed bullets found at Whittle's house—bullets that may have matched the caliber of a gun visible in surveillance footage of the Speedway robbery. We cannot say the district court abused its discretion.

## VII. CONCLUSION

For these reasons, Whittle's convictions are AFFIRMED.