*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0280p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

No. 04-5670

KENNETH TIMOTHY DIXON, SR.,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 03-00123—Aleta A. Trauger, District Judge.

Argued: May 31, 2005

Decided and Filed: June 27, 2005

Before: MARTIN and ROGERS, Circuit Judges; FORESTER, District Judge.[*]

---

## COUNSEL

**ARGUED:** William M. Cohen, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellant. Ronald C. Small, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** William M. Cohen, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellant. Ronald C. Small, Caryll S. Alpert, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellee.

MARTIN, J., delivered the opinion of the court, in which FORESTER, D. J., joined. ROGERS, J. (p. 6), delivered a separate concurring opinion.

---

## OPINION

---

BOYCE F. MARTIN, JR., Circuit Judge. Defendant Kenneth Timothy Dixon, Sr. is charged with attempted bank extortion in violation of 18 U.S.C. § 2113(a). Prior to trial, the district court held an evidentiary hearing on the admissibility of testimony by three prosecution witnesses: Dixon's son, Kenneth Timothy Dixon, Jr., whom we refer to as "Dixon, Jr.," and Dixon's former wives, Kathy Alexander and Penny Weems. Each witness was to testify at trial that, in their respective lay opinions, the suspect depicted in a photograph taken by a bank surveillance camera

---

[*] The Honorable Karl S. Forester, United States District Judge for the Eastern District of Kentucky, sitting by designation.

during the attempted extortion was, in fact, Dixon.  The district court excluded this identification testimony, as well as testimony by Weems concerning incriminating statements that Dixon allegedly made to Weems's father.  The United States appeals these evidentiary rulings.

## I.

On January 15, 2002, a man entered the mail room of an AmSouth Bank carrying a FedEx box that contained an extortion note.  Surveillance photographs were taken of the man and the package.  Defendant Dixon eventually surfaced as a suspect in the crime.  During the course of the investigation, Dixon, Jr., Alexander and Weems indicated to law enforcement officers that the individual depicted in the surveillance photograph resembled defendant Dixon.  Dixon denied being the person in the photograph, but admitted it looked like him.

The district court held a pretrial hearing on the admissibility of the identification testimony of Dixon, Jr., Alexander and Weems.  During the hearing, Dixon, Jr. testified that he had no doubt that the person depicted in the surveillance photograph was his father, defendant Dixon.  Dixon, Jr. indicated that he saw his father around Christmas of 2001 and that he may have also seen him in January 2002.  When asked whether his father tended to "change his appearance" or whether "he look[ed] the same all the time," Dixon, Jr. testified that he "[l]ooks the same to me."  Upon further questioning by counsel for the United States, Dixon, Jr. indicated that he does not pay attention to his father's hair style, facial hair or weight.  The district court explicitly asked Dixon, Jr., "[W]hen you were asked about . . . and shown those [surveillance] photos in April of '03, did you at that time remember what your father looked like in January of '02, in terms of facial hair, weight, hair style, hair color?"  J.A. 86.  Dixon, Jr. answered, "No, ma'am.  I just—it had looked like my dad.  I just—the picture looked like my dad.  I can't—I don't distinctly remember what he looked like at that time."

Kathy Alexander, one of Dixon's former wives, testified at the hearing that she was "100 percent" certain that the individual depicted in the photograph was Dixon.  When asked why she was so certain, she answered, "The way that he carried himself, the shape of his face.  He had on sunglasses that were familiar to me, because I purchased them for him.  That's about it."  Alexander indicated that she had lived on and off with Dixon from 1998 to 2001 and last saw him in October 2001, approximately three months prior to the offense.  She also indicated that during the period from 1998 to 2001, Dixon had changed his "haircut, facial hair, beard, moustache, goatee."  However, she stated that she had no reason to believe that Dixon had changed his appearance during the period from 2001, when she last saw him, to 2003, when she identified him in the surveillance photograph.  Additionally, when asked by the district court, "Does [Dixon] look pretty much the same as he looked in the surveillance photo?," Alexander answered, "Yes.  Except in the surveillance photo his hair is slicked back a little bit more, like he used gel or something."

Penny Weems, who had been married twice to Dixon and had a daughter with him, also testified at the hearing.  She stated that the person depicted in the photograph "looked like" Dixon.  Weems estimated that she had seen Dixon approximately twice a month in 2001 and 2002.  She could not say with any certainty, however, what Dixon looked like in January 2002; she knew nothing about his hair style or facial appearance at that time.  She testified that Dixon sometimes changed the way he looked by changing the length of his hair or the color of his beard.

Weems also testified about matters bearing on her potential bias against Dixon.  For example, she acknowledged that she had accused Dixon of physically and mentally abusing her during their marriage, and that in the past she had been angry about the abuse. Weems testified that at the time of the hearing she continued to be "disappointed" in Dixon because of the effect of his behavior on their daughter.  She also indicated that in the fall of 2002 she had been "mad" at Dixon because he was not paying child support; in October 2002, she filed a petition requesting that the

court find Dixon in contempt of court for failing to pay approximately $14,000 in past child support payments and that the court imprison him for up to six months as a penalty.

In addition to testifying about the identity of the man depicted in the surveillance photograph, Weems also testified about a conversation she had with Dixon at her house on May 31, 2003. Weems testified that she told Dixon about a conversation that she had previously had with her father, Carroll Duke, in which Duke told her that Dixon made certain statements to him that were incriminating in nature—specifically, that (1) Dixon asked Duke if Dixon could get away with something if he changed his hair or disguised himself; and (2) Dixon mentioned extortion at AmSouth Bank and $250,000. According to Weems, upon hearing this information, Dixon "lost the color in his face." Notably, counsel for the United States admitted that it would not call Duke as a witness because "he's done 180 degrees, for whatever reason, and does not recall those things." In an apparent attempt to avoid potential hearsay problems, counsel for the United States indicated that it was offering Weems's testimony only for Dixon's reaction to the information that Weems relayed to him—i.e., that he lost the color in his face—rather than for the truth of any matter asserted.

After the hearing, the district court issued an oral ruling excluding the identification testimony of Dixon, Jr., Alexander and Weems. In a subsequent written ruling, the district court also excluded, pursuant to Federal Rule of Evidence 403, Weems's testimony concerning the conversation she had with Dixon about the incriminating statements that he allegedly made to Duke. The United States filed this appeal challenging the foregoing evidentiary rulings by the district court.

## II.

A district court's evidentiary rulings are reviewed for abuse of discretion. *United States v. Wagner*, 382 F.3d 598, 616 (6th Cir. 2004). "Under this standard, we will leave rulings about admissibility of evidence undisturbed unless we are left with the definite and firm conviction that the [district] court . . . committed a clear error of judgment in the conclusion it reached." *Id.* (citation and internal quotation marks omitted). An abuse of discretion occurs when a district court relies on clearly erroneous findings of fact, improperly applies the law or uses an erroneous legal standard. *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir. 1995). "Broad discretion is given to district courts in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be lightly overruled." *Id.* (citation and internal quotation marks omitted).

### A. *Identification Testimony*

#### 1. *Kenneth Dixon, Jr. and Kathy Alexander*

The district court excluded the proposed identification testimony of Dixon, Jr. and Alexander on the ground that their testimony would not assist the jury in determining whether the individual depicted in the photograph was, in fact, Dixon. The United States argues that the district court's exclusion of this testimony amounts to an abuse of discretion.

Federal Rule of Evidence 701 permits the admission of opinion testimony from a lay witness when the witness's opinions are, among other requirements, "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Fed. R. Evid. 701(b). Both parties agree that lay opinion identification testimony is helpful to the determination of whether a suspect depicted in a photograph is the defendant where "there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *United States v. Farnsworth*, 729 F.2d 1158, 1160 (8th Cir. 1984). The parties also agree that "a number of factors" are relevant to the determination of whether a lay witness is more likely than the jury to identify the defendant correctly. *United States v. Pierce*, 136 F.3d 770, 774 (11th Cir. 1998).

In *Pierce*, a case cited by both parties, the Eleventh Circuit listed the following factors as relevant to the analysis: (1) the witness's general level of familiarity with the defendant's appearance; (2) the witness's familiarity with the defendant's appearance at the time the surveillance photograph was taken or when the defendant was dressed in a manner similar to the individual depicted in the photograph; (3) whether the defendant had disguised his appearance at the time of the offense; and (4) whether the defendant had altered his appearance prior to trial. *Id.* at 774-75 (citations omitted); *see also Farnsworth*, 729 F.2d at 1160 (holding that "[a] witness's opinion concerning the identity of a person depicted in a surveillance photograph is admissible if . . . the witness is familiar with the defendant's appearance around the time the surveillance photograph was taken and the defendant's appearance has changed [from the way he appeared at the time of the offense] prior to trial") (collecting cases).

Other important factors are the degree of clarity of the surveillance photograph and the quality and completeness with which the subject is depicted in the photograph. Lay opinion identification testimony is more likely to be admissible, for example, where the surveillance photograph is of poor or grainy quality, or where it shows only a partial view of the subject. *See, e.g., United States v. Jackman*, 48 F.3d 1, 4-5 (1st Cir. 1995) (upholding the admission of lay opinion identification testimony primarily because "[a]ll the surveillance photographs of the . . . robber are somewhat blurred, and they show only part of the robber's face, primarily the left side from eye-level down"); *United States v. Allen*, 787 F.2d 933, 936 (4th Cir. 1986) (upholding the admission of lay opinion identification testimony where one surveillance photograph showed one individual "with his jacket hood pulled over his head so that his hair, forehead and right eye are not visible," and two other photographs were "incomplete reproductions of the man in the bank," one showing "a profile of a man wearing a hardhat, rubbing his forehead, with his mouth open," and the other showing "little more than a blurred profile, with most of the left half of the individual's face hidden"), *vacated on other grounds*, 479 U.S. 1077 (1987).

Application of the foregoing factors to the facts of this case reveals that the district court did not abuse its discretion in excluding the lay opinion identification testimony of Dixon, Jr. and Alexander. Although both witnesses were indisputably familiar with Dixon's general appearance, the remaining factors weigh in favor of excluding their testimony. For example, the district court found that the evidence failed to establish that either Dixon, Jr. or Alexander was familiar with Dixon's appearance at the specific time of the offense. The court also found that the evidence indicated that Dixon had not altered his appearance prior to trial. These factual findings are supported by the evidence and are not clearly erroneous. Moreover, our review of the surveillance photograph indicates that it is not of particularly poor or grainy quality, and it fully depicts the suspect's body from the waist up. Accordingly, the district court did not abuse its discretion in excluding the identification testimony of Dixon, Jr. and Alexander on the ground that it would not significantly aid the jury in determining whether the person in the surveillance photograph is Dixon.

### 2. *Penny Weems*

The district court excluded Penny Weems's identification testimony on a different ground—i.e., that there were important areas of potential bias that could not be explored on cross-examination without bringing in highly prejudicial information concerning Dixon, such as his alleged spousal abuse and nonpayment of child support, and the effect of his actions on their daughter. In excluding Weems's identification testimony, the district court relied primarily upon the authority of *United States v. Calhoun*, 544 F.2d 291 (6th Cir. 1976). In *Calhoun*, this Court held that the district court abused its discretion in permitting the defendant's parole officer to give lay opinion testimony that the individual depicted in a surveillance photograph was, in fact, the defendant. The *Calhoun* holding was based in part upon the fact that "[t]he defendant could not explore the possible motives his parole officer might harbor in positively identifying him as the robber" and "could not freely examine the relationship with [the parole officer] on which [his]

perception was founded," without revealing the damaging fact that the defendant had previously been on parole. *Id.* at 295.

The United States argues that the *Calhoun* case is not controlling here because it has been limited by subsequent Sixth Circuit cases such as *United States v. Maddox*, 944 F.2d 1223, 1231 (6th Cir. 1991), and *United States v. Monsour*, 893 F.2d 126, 128-29 (6th Cir. 1990). We disagree. In *Maddox*, this Court did note that *Calhoun* was factually unique, but not in any way that would preclude its application to this case. In fact, *Maddox* recognized the validity of excluding testimony where the witness's "preexisting relationship" with the defendant was such that "the defendant would have had to go into highly prejudicial matters in order to explore possible motives" for the witness's testimony. 944 F.2d at 1231. Neither *Maddox* nor *Monsour* involved any such preexisting relationship, and thus the danger noted in *Calhoun* did not apply in those particular cases. In this case, by contrast, Weems and Dixon did have a preexisting relationship, the nature of which would have made it difficult for Dixon to cross-examine Weems without revealing highly prejudicial information. Even though the prejudicial information involved in *Calhoun* was the defendant's criminal record, we see no reason why *Calhoun*'s reasoning should not logically apply to other types of prejudicial information as well, such as allegations of spousal abuse and nonpayment of child support. Therefore, we hold that the district court committed no abuse of discretion in excluding Weems's identification testimony.

### B. *Weems's Testimony Concerning Her Conversation With Dixon*

The United States also argues that the district court abused its discretion in excluding, pursuant to Federal Rule of Evidence 403, Weems's testimony about her conversation with Dixon. As stated, the United States offered Weems's testimony solely for Dixon's reaction—i.e., the loss of color in his face—to Weems's revelation that Duke told her that Dixon made incriminating statements about the extortion attempt. Rule 403 authorizes the exclusion of relevant evidence when, among other things, "its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. In our opinion, the probative value of Dixon's alleged reaction is slight, given that the loss of color in his face could have been due to any number of factors other than guilt. The danger of unfair prejudice, by contrast, is significant. A jury would likely go beyond Dixon's reaction—which was the only basis offered for the admissibility of Weems's testimony—and consider the substantive content of Dixon's alleged statements to Duke; this would be particularly unfair given that, as the United States admits, Duke will not be called as a government witness because he now has no recollection that Dixon ever made any incriminating statements to him. Therefore, we hold that the district court did not abuse its discretion in excluding Weems's testimony concerning her conversation with Dixon.

### III.

For these reasons, the district court's evidentiary rulings are AFFIRMED.

---

**CONCURRENCE**

---

ROGERS, Circuit Judge, concurring. I concur based on the particularly strong deference we properly accord discretionary evidentiary decisions made by the district court. In my view, a decision by the district court to *admit* the identification testimony of Dixon Jr., Alexander, and Weems would clearly have been within the district court's discretion, and our decision today is not to the contrary.

The district court's decision to exclude the testimony of Dixon Jr. and Alexander, in particular, tests the outer bounds of our deference. Someone who has lived with a defendant has presumably seen him in myriad contexts – asleep and awake, tired and energetic, happy and sad, angry and peaceful, morning and evening, etc., etc. Such a person is presumptively better able to identify the defendant in a photo than a juror who is comparing the photo with a one-time live view of the defendant.

In excluding the testimony, the district court relied on testimony by Dixon Jr. and Alexander that Dixon "looks the same" now as he did before or during the period of the crime. Yet it is only natural that a person who has lived with a defendant, and become familiar with his many faces, would consider all the faces to be permutations of the same familiar figure, and testify that the person has not changed. To exclude such evidence disregards such a commonsense explanation.

I would have been much more comfortable affirming the admission of the Dixon Jr. and Alexander identifications. However, affirmance is warranted when we accord the serious deference that is proper when we review discretionary evidentiary decisions of a district court, especially when those decisions are based in part on live testimony of the challenged witness.