**2016 IL 118667**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

———————————————

(Docket No. 118667)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JEREMY R. THOMPSON, Appellee.

*Opinion filed January 22, 2016.*

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Freeman, Thomas, Kilbride, Karmeier, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Jeremy Thompson, was convicted of violating the Methamphetamine Control and Community Protection Act (Act) (720 ILCS 646/25(a)(2), (d)(2) (West 2010)) following a jury trial in which the circuit court of Hamilton County admitted lay opinion identification testimony of four witnesses pursuant to Illinois Rule of Evidence 701 (eff. Jan. 1, 2011). The four witnesses all identified defendant as the person depicted in a surveillance videotape or still photographs that were taken from the crime scene.

¶ 2     The appellate court reversed and remanded the cause, concluding that the circuit court erred in admitting the testimony because none of the witnesses aided

the jurors' own identification of who was depicted in the surveillance video and, therefore, the testimony encroached upon the function of the jury. 2014 IL App (5th) 120079. For the reasons that follow, we reverse the appellate court's judgment.

¶ 3                                  BACKGROUND

¶ 4        Defendant, Jeremy Thompson, was indicted in the circuit court of Hamilton County on two counts relating to events that occurred on July 21, 2011, at the Hamson Ag farm supply company in Dahlgren, Illinois. Count I charged defendant with procurement of anhydrous ammonia with the intent to be used to manufacture methamphetamine in violation of section 25(a)(2) of the Act. 720 ILCS 646/25(a)(2) (West 2010). Count II charged defendant with tampering with anhydrous ammonia equipment in violation of section 25(d)(2) of the Act. 720 ILCS 646/25(d)(2) (West 2010).

¶ 5        Prior to trial, defendant filed a motion *in limine* regarding the admissibility of lay opinion identification testimony. Defendant anticipated the State would offer various witnesses to testify they believed defendant was shown on a surveillance video and still images produced from that video recorded at Hamson Ag on July 21, 2011. Defendant asserted such testimony went to an ultimate fact and would invade the province of the jury.

¶ 6        The circuit court denied defendant's motion. Relying on *People v. Starks*, 119 Ill. App. 3d 21 (1983), the court concluded that the witnesses could provide identification testimony, as long as it was based upon their personal knowledge of defendant.

¶ 7        At trial, the State first called Deputy Jason Stewart of the Hamilton County sheriff's department. Stewart described in general how methamphetamine is produced and explained that its production involves the use of anhydrous ammonia, which is often stolen from local farm supplies. In June 2011, Stewart oversaw the installation and maintenance of a surveillance camera at Hamson Ag, which he aimed at three tanks containing anhydrous ammonia. The owner had contacted the sheriff's department because their equipment was often damaged by thieves.

¶ 8        On the morning of July 21, 2011, Stewart was dispatched to Hamson Ag. Upon seeing that three tanks containing anhydrous ammonia had their caps removed,

Stewart reviewed and copied recordings made by the surveillance camera. Of the 100 video clips recorded, 2 pertained to the instant case. Stewart testified that the surveillance video showed a white male who had short, dark hair, with a balding or thinning spot on the back of his head, a large forehead and receding hairline, and who was wearing a gray cut-off T-shirt and black baggy pants. Stewart described how, in the video, the man was carrying a five-gallon bucket and a green soda bottle with a clear hose attached. Stewart testified that, based on his training and experience, a soda bottle attached to a hose is commonly used to steal anhydrous ammonia. Stewart then stated that, in the video, the subject walked in front of the tanks, out of view, and then a few seconds later walked back into view. The subject then walked between two of the tanks, sat the bucket down, and then climbed onto the tire of one of the tanks. Thereafter, the subject emerged from between the tanks carrying the bucket and soda bottle with the hose and ran off.

¶ 9        Stewart testified he did not recognize the male, but circulated the video via the departmental computer and gave a copy to Chief Deputy William Sandusky to distribute to other counties and agencies. Stewart also made a color still image from the video and circulated that to various agencies. The color still image was marked as exhibit No. 2 at trial.

¶ 10       The video was then played for the jury.

¶ 11       Chief Deputy William Sandusky of the Hamilton County sheriff's department next testified. Sandusky stated he spoke with Stewart on or around July 11, 2011, and viewed the surveillance video. Sandusky testified he "did not immediately recognize the subject in the video." Sandusky then emailed a still image to the Jefferson County sheriff's department, as well as the Mt. Vernon and Benton police departments. Sandusky testified he was contacted several days later by Ronnie Almaroad, head of the narcotics division at the Mt. Vernon police department.

¶ 12       Thereafter, Sandusky testified that, on August 17, 2011, he conducted a short interview with defendant. After giving defendant his *Miranda* rights and defendant agreeing to talk, Sandusky told defendant he wanted to talk about the theft of anhydrous ammonia and the manufacture of methamphetamine in and around Hamilton County. Sandusky advised defendant "he had been caught on surveillance stealing anhydrous ammonia." Sandusky then testified:

> "After I informed [defendant] that he had been caught on surveillance video, he asked that he could—wanted to know if he could see the evidence. I showed

him the still image. And he looked at it for several seconds and said, I wish this wasn't me—or I wish I could say this wasn't me, but it is."

Defendant also stated the photo was "pretty cool" and wanted a copy and asked if it would be placed in the newspaper. According to Sandusky, defendant admitted he had been manufacturing methamphetamine for four to five months and had stolen approximately two gallons of anhydrous ammonia from Hamson Ag on four or five different occasions. Defendant stated he would either use the anhydrous ammonia to manufacture methamphetamine or trade it to get cigarette money. Defendant also told Sandusky he had been purchasing pseudoephedrine over the last four or five months and that one half of it was used to manufacture methamphetamine and the other half he used for his allergies.

¶ 13 According to Sandusky, defendant stated he was not successful that day in acquiring anhydrous ammonia because the hose he had was too small and, in his words, he "kept getting gassed out while trying to get anhydrous ammonia," *i.e.*, he was overcome by the gas. Sandusky was then asked what appeared to be depicted in the video and still image. Over defendant's objection, Sandusky testified it "depicts Jeremy Thompson walking away from the anhydrous ammonia tanks, carrying *** [what] appears to be a five-gallon bucket, as well as a soda bottle attached to a plastic hose."

¶ 14 Sandusky testified that, as he and defendant were leaving the interview room, defendant stated it was not really him in the video since he had been in custody in Johnson County. Sandusky testified that a subsequent inquiry revealed defendant had been released from custody on July 18, three days before this event.

¶ 15 On cross-examination, Sandusky testified that defendant had been arrested in Jefferson County and had been in custody prior to his interview. However, Sandusky was not sure whether the Jefferson County sheriff's department or the Mt. Vernon police department had arrested defendant. He also did not know how long defendant had been in custody prior to the time he interviewed him. However, he did state that defendant had been picked up "on our warrant."

¶ 16 The State next called Ronald Hamson, owner of Hamson Ag. He stated he has had almost continuous problems with thieves. He contacted the sheriff's department on July 21 because he was advised by an employee that caps were off of three anhydrous ammonia tanks. Hamson was shown exhibit No. 2 and stated the

individual depicted was not an employee, had never been an employee, and did not have permission to be on the property.

¶ 17    Officer Kevin Jackson of the narcotics division of the Mt. Vernon police department testified next. Jackson testified he assisted the Hamilton County sheriff's department and that Hamilton County had provided a video of a person stealing anhydrous ammonia to his captain. His captain then circulated a still image to the patrol division. When asked to describe what was depicted on the still image as an exhibit, Jackson stated it was defendant carrying a five-gallon bucket with a plastic tube attached to what looked like a soda bottle.

¶ 18    When asked if he was able to identify who was depicted on the still image when it was first shown to him, Jackson responded: "At the time, no. I knew it resembled [defendant], but the video—the picture that I had was a black and white picture. And it had been—looked like it had been Xeroxed or faxed." Jackson testified that, after viewing the video, he was "able to positively identify the person to be [defendant]." Over defendant's objection, Jackson identified defendant in open court.

¶ 19    On cross-examination, Jackson admitted he had not viewed the video until a week before trial.

¶ 20    Jackson also testified he released the photo to the patrol division to possibly identify the individual depicted in it. Jackson stated that within a week of receiving the still image, he showed it to Jessica Joslin.

¶ 21    Jessica Joslin testified that sometime either in July or August 20, 2011, Jackson showed her a still image. Joslin believed it depicted a person she knew by the name "Jeremy," but whom she had never met nor had a conversation with. Joslin, however, stated she had "seen him sleeping on a front porch one time." Joslin then identified defendant in court.

¶ 22    On cross-examination, Joslin admitted that when she saw "Jeremy," she was strung out on methamphetamine. Joslin also admitted her husband was currently in the Jefferson County jail with charges pending against him for various drug-related offenses, and parole violations based on a tampering with anhydrous ammonia conviction. Joslin stated she saw Jeremy sleeping from a close distance away and knew it was him.

¶ 23    Officer Brian Huff of the Mt. Vernon police department testified he viewed a still image at the roll call table. This image was a black and white version of exhibit No. 2, with "Any Body Know this guy? D-4" written at the top. Huff viewed the video after seeing the still image. Over defendant's objection, Huff stated he recognized the person in the image as defendant and identified defendant in the courtroom. Huff stated the still image he viewed was somewhat blurry, but testified he recognized defendant because he "had previous dealings with him." Huff notified his supervisor, Captain Almaroad, that he recognized the person in the video as defendant.

¶ 24    After Huff's testimony, the State rested. Defendant renewed his motion *in limine* regarding the lay opinion testimony, which the court denied. Defendant moved for a directed verdict, which was also denied.

¶ 25    Defendant then presented the testimony of two alibi witnesses. Christina Miller testified that during the week of July 21, 2011, she was doing home repairs and defendant helped her. Initially, Miller stated defendant showed up on July 20 around dark and worked throughout the whole evening. She testified he fell asleep on the loveseat in her living room that night and never left in the morning. Miller was not able to identify the individual in the surveillance video but stated it could be defendant, because she was not 100% percent certain of the dates defendant had helped her. On cross-examination, Miller repeated she was unsure whether defendant slept at her home on July 20.

¶ 26    Shelly Myogeto next testified on defendant's behalf. Myogeto stated Miller is her aunt by marriage. During the week of July 21, she worked at Miller's home several days and defendant helped. Myogeto had known defendant since high school and the two had been dating for about one and a half months at the time of the incident in question. Myogeto testified that defendant began working at Miller's home around 8 p.m. on July 20, that both of them spent the night at Miller's home, and the next morning, they all went resale and yard sale shopping from 8 a.m. to 11 a.m. Myogeto testified that defendant was with her the entire time. With respect to the surveillance video, Myogeto testified the individual looked like defendant, but stated it could not be him since he was with her. On cross-examination, Myogeto admitted she had a 2005 felony conviction for possession.

¶ 27    Defendant then rested.

¶ 28    As part of closing argument, the State argued: "[Y]ou, yourselves, are the trier of fact to decide whether that's really [defendant] in the video because you also heard testimony from his girlfriend, who's a felon, and, also, from a lady who he may or may not have helped on the 20th and 21st."

¶ 29    As part of closing argument, defense counsel stated:

> "The ultimate question in this case is: Who is on the video? Is it Mr. Thompson, or is it somebody else? You've heard how Mr. Thompson was identified. Nobody in Hamilton County knew who was on the video. So the sheriff's department shipped this picture out to other police agencies. And we have two Mt. Vernon police officers who are able to identify Mr. Thompson and say, That's him."

Thereafter, counsel argued, "Where does that identification actually come from? Ms. Joslin, who testified yesterday. And as the judge has said and as both myself and the state's attorney have told you and will continue to tell you, you are the believability [*sic*] of the witnesses." Subsequently, counsel argued: "The question is: Who was it [messing around at the plant who should not be], what steps were taken to identify them, and what steps were not taken to identify them." Lastly, counsel argued:

> "All of this identification from the police doesn't mean anything. The ultimate question in this case is: Who is on the video? It doesn't matter what the cop says. It doesn't matter what any of the defense witnesses say about who they think is on the video. The twelve of you have to make that decision. And the question is: Can you tell beyond a reasonable doubt who's on that video or not? There's some white guy with dark hair running around. But when you view this video, I would posit to you, you can't make an identification beyond a reasonable doubt that it's Mr. Thompson; particularly, in the face of the alibi witnesses *** the activities that occurred that day with him being present in Mt. Vernon, a county away."

¶ 30    After being instructed by the court, the jury retired at 3:15 p.m. At 3:30 p.m., the jury requested a closer view of the video. After viewing the video twice, the jury returned to the jury room at 3:50 p.m. At 4 p.m., the jury returned guilty verdicts on both counts. After denying defendant's motion for a judgment notwithstanding the verdict and defendant's motion for a new trial, the court sentenced defendant as an

habitual criminal to 18 years' imprisonment on count I and 7 years' imprisonment on count II, to run concurrently. Defendant appealed.

¶ 31 On appeal, defendant argued the trial court erred in allowing the testimony of the police officers and Joslin identifying him in the video or still image. The appellate court agreed, finding the testimony constituted improper lay opinion testimony because none of the witnesses aided the jurors' own identification of who was depicted in the surveillance and, therefore, the testimony encroached upon the function of the jury to the extent there could be no confidence in the verdict. 2014 IL App (5th) 120079, ¶ 23.

¶ 32 The appellate court explained that *Starks* established a two-part test for determining the admissibility of identification testimony. *Id.* ¶ 29. First, the witness must have been familiar with defendant before the offense. Second, the testimony must resolve the issue of identification without invading the duties of the trier of fact. *Id. Starks* discussed two situations where testimony would aid the trier without invading its province: where a defendant's appearance has changed since the time of the recording and where the recording is unclear or a limited depiction. *Id.*

¶ 33 The appellate court found all four witnesses who identified defendant from the video or the still image met the first part of the *Starks* test. *Id.* ¶ 32. However, the appellate court found none of the witnesses met the second part of the test—none had a better perspective than the jury to interpret the surveillance footage and none alluded to a change in appearance and there was no evidence of that in the record. *Id.* ¶ 33.

¶ 34 Thus, according to the appellate court, this left only the situation where there was an unclear depiction. *Id.* ¶ 34. The court found the still image was unclear.[1] *Id.* ¶ 35. Two of the witnesses (Huff and Joslin) testified they identified defendant from the still image. *Id.* ¶ 36. The appellate court found their identification testimony would be of questionable value because mannerisms and movements cannot be gleaned from a still image and neither described any particular feature or aspect of defendant that would have allowed them to identify defendant better than the jury. *Id.* ¶ 37. Thus, the court concluded there was no reason to find either Huff or Joslin could make a more informed assessment of who was depicted in the still

---

[1]The appellate court does not distinguish between the black and white image which was identified at trial as exhibit No. 5 and the color image identified as exhibit No. 2.

image than the jury itself and, in fact, found the jury was in a superior position to these witnesses because they had the video to view. *Id.* ¶ 38.

¶ 35　　The appellate court then concluded the video was a clear depiction, which the jury needed no help in deciphering. *Id.* ¶ 39. Moreover, according to the court, nothing indicated either Jackson or Sandusky, who both identified defendant in the video, had a better perspective to identify who was in the video than the jury. *Id.* ¶¶ 41-43. Therefore, admission of their testimony was improper. The court then found that even if the testimony was proper lay opinion identification testimony, introduction of the evidence was prejudicial to defendant (*id.* ¶¶ 51-58), rendered other evidence inconsequential (*id.* ¶ 59), erased any reasonable doubt the jurors might otherwise have held, and, therefore, no confidence could be placed in the verdict specifically, that the jury reached its verdict on its *own* evaluation of the video. *Id.* ¶¶ 59-60.

¶ 36　　The appellate court then reasoned that, because the trial court never considered whether any of these witnesses met the second part of the *Starks* test, this led to the more plausible explanation that the circuit court allowed this testimony in order to explain police procedure. *Id.* ¶ 44. However, the court concluded that the record did not justify admission of the testimony under this theory. *Id.*

¶ 37　　We granted the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2013).

¶ 38　　　　　　　　　　　　　　　　ANALYSIS

¶ 39　　At issue in this case is the admissibility of lay opinion identification testimony under Illinois Rule of Evidence 701. Rule 701 provides:

　　　"If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Ill. R. Evid. 701 (eff. Jan. 1, 2011).

¶ 40　　This court has never addressed the admissibility of lay opinion identification testimony under Rule of Evidence 701 or whether a law enforcement officer may

offer such testimony under the rule. Because Rule of Evidence 701 is modeled after Federal Rule of Evidence 701 (Fed. R. Evid. 701), we may look to federal law, as well as state decisions interpreting similar rules for guidance.

¶ 41        Like its federal counterpart, the plain language of Rule of Evidence 701 states that lay opinion identification testimony is admissible if (a) the testimony is rationally based on the perception of the witness and (b) the testimony is helpful to a clear understanding of the witness's testimony or a determination of a fact in issue. *United States v. Beck*, 418 F.3d 1008, 1014 (9th Cir. 2005); *United States v. Jackman*, 48 F.3d 1, 4 (1st Cir. 1995); *State v. George*, 206 P.3d 697, 701 (Wash. Ct. App. 2009). Lay opinion identification testimony is helpful to a determination of whether the individual depicted in a surveillance recording is the defendant where "there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." (Internal quotation marks omitted.) *United States v. White*, 639 F.3d 331, 336 (7th Cir. 2011); *United States v. Dixon*, 413 F.3d 540, 545 (6th Cir. 2005); *United States v. Henderson*, 68 F.3d 323 (9th Cir. 1995); *Jackman*, 48 F.3d at 5; *United States v. Stormer*, 938 F.2d 759, 761 (7th Cir. 1991); *United States v. Allen*, 787 F.2d 933, 936 (4th Cir. 1986); *United States v. Farnsworth*, 729 F.2d 1158, 1160 (8th Cir. 1984); *Robinson v. People*, 927 P.2d 381, 382 (Colo. 1996) (*en banc*); *State v. Barnes*, 212 P.3d 1017, 1022 (Idaho Ct. App. 2009); *State v. Jefferson*, 341 S.W.3d 690, 697 (Mo. Ct. App. 2011); *George*, 206 P.3d at 701.

¶ 42        In most jurisdictions, a showing of sustained contact and/or special knowledge of the defendant is not a prerequisite to a lay witness giving identification testimony. *United States v. Holmes*, 229 F.3d 782, 788 (9th Cir. 2000); *Henderson*, 68 F.3d at 326. Instead, a lay witness need only have sufficient contact with the defendant, which the jury would not possess, to achieve a level of familiarity that renders the lay opinion helpful. *Beck*, 418 F.3d at 1014; *Henderson*, 68 F.3d at 326; *Holmes*, 229 F.3d at 688; *Jackman*, 48 F.3d at 4-5; *State v. Miller*, 741 A.2d 448, 451 (Me. 1999). See, *e.g.*, *Holmes*, 229 F.3d at 788-89 (witness met defendant approximately six times prior to robbery for at least 30 minutes each time); *United States v. Miranda*, 986 F.2d 1283, 1285 (9th Cir. 1993) (two longtime acquaintances); *United States v. Langford*, 802 F.2d 1176, 1179 (9th Cir. 1986) (two witnesses; one met with defendant approximately 50 times and other knew him most of his life); *United States v. Saniti*, 604 F.2d 603, 605 (9th Cir. 1979) (*per curiam*) (two roommates); *United States v. Young Buffalo*, 591 F.2d 506, 513 (9th Cir. 1979) (estranged wife and probation officer); *United States v. Butcher*,

557 F.2d 666, 667 n.3 (9th Cir. 1977) (several witnesses who had observed defendant on multiple occasions or had total exposure to him for at least two hours); *Moreland v. State*, 53 A.3d 449, 455 (Md. Ct. Spec. App. 2012) (police officer who knew defendant for 40 to 45 years and had intimate knowledge of his appearance before robbery). But see *United States v. LaPierre*, 998 F.2d 1460, 1465 (9th Cir. 1993) (lay opinion identification by investigating police officer inadmissible where witness did not know defendant, had never seen him in person, and identified defendant solely on review of photographs of defendant).

¶ 43    A number of factors have been identified as relevant to a determination of whether a lay witness is more likely than the jury to identify the defendant correctly. *Dixon*, 413 F.3d at 545; *United States v. Pierce*, 136 F.3d 770, 774 (11th Cir. 1998); *Barnes*, 212 P.3d at 1022-23. Whether lay opinion identification testimony is helpful is generally based on a "totality of the circumstances." *Barnes*, 212 P.3d at 1024; *Beck*, 481 F.3d at 1015.

¶ 44    One relevant factor is the witness's general level of familiarity with the defendant's appearance. See, *e.g.*, *Jackman*, 48 F.3d at 6-7 (witnesses knew defendant for a long time and had seen him on many occasions); *Pierce*, 136 F.3d at 775 (witnesses familiar with defendant's appearance and facial features based on repeated contacts with him over significant periods of time); *United States v. Wright*, 904 F.2d 403, 405 (8th Cir. 1990) (witnesses each saw defendant numerous times over extended period of time); *Farnsworth*, 729 F.2d at 1160 (one witness met with defendant at least 75 times; another about 20 times); *United States v. Barrett*, 703 F.2d 1076, 1085-86 (9th Cir. 1983) (live-in girlfriend). *Cf. Allen*, 787 F.2d at 935-36 (witnesses had known defendant for some time); *United States v. Jackson*, 688 F.2d 1121, 1123, 1125 (7th Cir. 1982) (admitting testimony even though witness had seen defendant only once before). But see *LaPierre*, 998 F.2d at 1465 (error to admit testimony where witness did not know defendant and had never seen him in person).

¶ 45    With respect to a witness's familiarity with a defendant, several courts have pointed out:

> "[T]estimony by those who knew defendants over a period of time and in variety of circumstances offers to the jury a perspective it could not acquire in its limited exposure to defendants. Human features develop in the mind's eye over time. These witnesses had interacted with defendants in a way the jury

could not, and in natural settings that gave them a greater appreciation of defendants' normal appearance. Thus, their testimony provided the jury with the opinion of those whose exposure was not limited to three days in a sterile courtroom setting." *Allen*, 787 F.2d at 936.

See also *Barnes*, 212 P.3d at 1021, 1023 (hair patterns, posture, movements, and expressions); *Miller*, 741 A.2d at 452 (different settings, lighting, and under different circumstances).

¶ 46 A second relevant factor is the witness's familiarity with the defendant's appearance at the time the surveillance photograph was taken or whether the defendant was dressed in a manner similar to the individual depicted. *Dixon*, 413 F.3d at 545; *Pierce*, 136 F.3d at 774; *State v. Collins*, 716 S.E.2d 255, 260 (N.C. Ct. App. 2011); *State v. Belk*, 689 S.E.2d 439, 441 (N.C. Ct. App. 2009).

¶ 47 A third relevant factor is whether the defendant disguised his appearance at the time of the offense. *United States v. Ellis*, 121 F.3d 908, 927 (4th Cir. 1997), (defendants wore masks and hooded sweatshirts); *United States v. Towns*, 913 F.2d 434, 445 (7th Cir. 1990) (defendant wore stocking cap, sunglasses, and bulky clothing). Similarly, a fourth relevant factor is whether the defendant had altered his appearance prior to trial. *Dixon*, 413 F.3d at 545; *United States v. Ingram*, 600 F.2d 260, 261 (10th Cir. 1979). See also *United States v. Lucas*, 898 F.2d 606, 610 (8th Cir. 1990) (defendant appeared clean-shaven at trial); *Farnsworth*, 729 F.2d at 1160 (defendant grew a full beard and on the day of robbery had worn a scarf over his face); *Barrett*, 703 F.2d at 1086 (defendant appeared clean-shaven at trial); *United States v. Borrelli*, 621 F.2d 1092, 1095 (10th Cir. 1980) (defendant changed hairstyle and grew a moustache); *Moreland*, 53 A.3d at 455 (witness lost weight and exhibited physical signs of paralysis). *Cf. LaPierre*, 998 F.2d at 1465 (holding it error to admit testimony where, among other things, there was no evidence that defendant's appearance had changed since the time of the robbery).

¶ 48 A fifth relevant factor is the degree of clarity of the surveillance recording and the quality and completeness of the subject's depiction in the recording. *Dixon*, 413 F.3d at 545; *Barnes*, 212 P.3d at 1022. Specifically, many courts have held that lay opinion identification testimony is more likely to be admissible where the surveillance recording is of poor or grainy quality, or where it shows only a partial view of the subject. *Jackman*, 48 F.3d at 5 (upholding admission of lay opinion identification testimony primarily because surveillance photographs were

somewhat blurred and showed "only part of the robber's face, primarily the left side from eye-level down"); *Wright*, 904 F.2d at 405 (allowing testimony where picture showed defendant as he removed mask was not a "model of clarity"); *Allen*, 787 F.2d at 936 (upholding admission of lay opinion identification testimony where one surveillance photograph showed one individual with his jacket hood pulled over his head so his hair, forehead, and right eye were not visible, and two other photographs were incomplete depictions where one showed "a profile of a man wearing a hardhat, rubbing his forehead, with his mouth open," and the other showed "little more than a blurred profile, with most of the left half of the individual's face hidden").

¶ 49        The existence of one or more of these factors indicates there is " 'some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury.' [Citation.]" *Barnes*, 212 P.3d at 1024. Moreover, it has often been held that the extent of a witness's opportunity to observe the defendant goes to the weight to be given the testimony, not its admissibility. *Beck*, 418 F.3d at 1015; *Wright*, 904 F.2d at 405; *Allen*, 787 F.2d at 936; *Jackson*, 688 F.2d at 1125; *Barnes*, 212 P.3d at 1023; *Robinson*, 927 P.2d at 383. A court reviews the trial court's decision to admit lay opinion identification testimony under an abuse of discretion standard. *Beck*, 418 F.3d at 1016; *United States v. Matsumaru*, 244 F.3d 1092, 1101 (9th Cir. 2001); *Henderson*, 68 F.3d at 325; *Jackman*, 48 F.3d at 4; *Keller v. United States*, 38 F.3d 16, 31 (1st Cir. 1994); *Holmes*, 229 F.3d at 788; *George*, 206 P.3d at 701.

¶ 50        Based on the above principles, we now hold that opinion identification testimony is admissible under Rule of Evidence 701 if (a) the testimony is rationally based on the perception of the witness and (b) the testimony is helpful to a clear understanding of the witness's testimony or a determination of a fact in issue. Lay opinion identification testimony is helpful where there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury. A showing of sustained contact, intimate familiarity, or special knowledge of the defendant is not required. Rather, the witness must only have had contact with the defendant, that the jury would not possess, to achieve a level of familiarity that renders the opinion helpful.

¶ 51        We adopt a totality of the circumstances approach and agree with the above authorities that the following factors should be considered by the circuit court in determining whether there is some basis for concluding the witness is more likely

to correctly identify the defendant: the witness's general familiarity with the defendant; the witnesses' familiarity with the defendant at the time the recording was made or where the witness observed the defendant dressed in a manner similar to the individual depicted in the recording; whether the defendant was disguised in the recording or changed his/her appearance between the time of the recording and trial; and the clarity of the recording and extent to which the individual is depicted. However, the absence of any particular factor does not render the testimony inadmissible.

¶ 52    Accordingly, we decline to adhere to the rules for admission of lay identification testimony set forth in *Starks*, which the appellate court relied on. The two-part test of *Starks* is at odds with the great weight of authority. Specifically, as stated above, a witness need not have familiarity with the defendant before or at the time of the recording to testify. Moreover, we reject *Starks* to the extent it limits identification testimony solely to those instances where either the defendant's appearance has changed between the time of the recording and trial or where the recording lacks clarity to render such testimony admissible.

¶ 53    We also agree with the majority view that the extent of a witness's opportunity to observe the defendant goes to the weight of the testimony, not its admissibility. Moreover, review of the circuit court's decision to admit lay opinion identification testimony is reviewed for an abuse of discretion.

¶ 54    Thus, we hold that lay identification testimony is admissible under the foregoing principles, with the proviso, however, that the probative value of the testimony must outweigh any prejudice under Illinois Rule of Evidence 403 (eff. Jan. 1, 2011). If such testimony is admitted under the above standards, it would not invade the province of the jury because the jury is free to reject or disregard such testimony and reach its own conclusion regarding who is depicted in the surveillance recording. *White*, 639 F.3d at 335-36; *Jackson*, 688 F.2d at 1126; *State v. Hardy*, 884 P.2d 8, 10 (Wash. Ct. App. 1994).

¶ 55    In addition to general principles of lay opinion identification testimony, the present case also raises questions as to whether and under what circumstances law enforcement officers may provide identification testimony. Defendant maintains there should be a prohibition on the use of law enforcement identification testimony. In support, defendant relies on *United States v. Calhoun*, 544 F.2d 291, 295-97 (6th Cir. 1976), which held, it is a *per se* abuse of discretion for a district

court to admit testimony from a defendant's parole officer that defendant was depicted in a surveillance video because the defendant could not effectively cross-examine the officer regarding his bias without revealing their relationship and, thus, the defendant's prior criminal record. Defendant argues a defendant would be prejudiced by allowing identification testimony from law enforcement officers because a complete and uninhibited cross-examination regarding the witness's familiarity is not possible since questions could reveal information about the defendant's criminal past and unfairly cause the jury to focus on that. As such, defendant argues law enforcement officers should not be allowed to offer lay opinion identification testimony.

¶ 56        Similar challenges have been rejected by the overwhelming majority of federal courts primarily on the basis of *Delaware v. Van Arsdall*, 475 U.S. 673 (1986). In that case, the Supreme Court held that a defendant is only denied his sixth amendment right to confrontation when the trial court prohibits the defendant from engaging in cross-examination. *Wright*, 904 F.2d at 406. The majority of courts have concluded that the right of confrontation is not denied by allowing law enforcement officers to give lay identification testimony because the inability to cross-examine is not imposed by the court, but rather, is a tactical decision made by defense counsel. Therefore, there is no sixth amendment violation. See *United States v. Helmstetter*, 479 F.3d 750, 755 (10th Cir. 2007); *Jackman*, 48 F.3d at 6; *United States v. Pace*, 10 F.3d 1106, 1114 (5th Cir. 1993); *Stormer*, 938 F.2d at 763-64; *Wright*, 904 F.2d at 406; *Allen*, 787 F.2d at 937-38; *Farnsworth*, 729 F.2d at 1162; *United States v. Hines*, 696 F.2d 722, 731 (10th Cir. 1982). We agree with the majority of courts and decline to follow *Calhoun*. There is no *per se* rule against admission of a law enforcement officer's identification testimony.

¶ 57        We note, however, in most of the foregoing cases, there was no testimony divulging either the circumstances of the relationship between the law enforcement officer and the defendant, or the fact that the witness was a law enforcement officer. Rather, the witnesses only testified to the number of times and duration of their contact with the defendants. See *Stormer*, 938 F.2d at 763; *Allen*, 787 F.2d at 938; *Farnsworth*, 729 F.2d at 1161. Moreover, in most of the cases, certain safeguards were taken to afford the defendants the ability to cross-examine the witnesses to establish their familiarity with the defendant and any bias or prejudice. See, *e.g.*, *Pierce*, 136 F.3d at 776.

¶ 58    For example, in *Allen*, the court approved a procedure whereby the defendant was permitted to object to the officer's testimony and the foundation for the testimony was established outside the presence of the jury. *Allen*, 787 F.2d at 937-38. This allowed the trial court to fully balance the probative value of the testimony against any prejudice to defendant when deciding whether or not to admit the testimony. Additionally, the defendant was permitted to fully cross-examine the witness outside the presence of the jury. Lastly, the prosecution was instructed not to reveal the occupation of the witness. The *Allen* court concluded that the use of this procedure left the decision of whether to discuss the prejudicial information entirely with the defense and, thus, ensured that the testimony did not unfairly prejudice the defendant. See also *Stormer*, 938 F.2d at 763-64 (similar precautionary procedures taken plus preliminary instruction regarding the weight to be given lay opinion testimony was given before testimony heard and in final charge to jury).

¶ 59    We find these precautionary procedures sufficiently safeguard a defendant's rights. We hold, therefore, that when the State seeks to introduce lay opinion identification testimony from a law enforcement officer, the circuit court should afford the defendant an opportunity to examine the officer outside the presence of the jury. This will provide the defendant with an opportunity to explore the level of the witness's familiarity as well as any bias or prejudice. Moreover, it will allow the circuit court to render a more informed decision as to whether the probative value of the testimony outweighs any potential prejudice. Although a witness may identify himself as a law enforcement officer, his testimony involving his acquaintance with the defendant should consist only of how long he knew the defendant and how frequently he saw him or her. Moreover, to lessen any concerns regarding invading the province of the jury or usurping its function, the circuit court should properly instruct the jury, before the testimony and in the final charge to the jury, that it need not give any weight at all to such testimony and also that the jury is not to draw any adverse inference from the fact the witness is a law enforcement officer if that fact is disclosed. See *Henderson*, 68 F.3d at 328.

¶ 60    We now apply the rules set forth above to the present case to determine whether the circuit court abused its discretion in admitting the testimony of the four witnesses. The first element of Rule 701 is not contested; defendant concedes and the appellate court found the testimony was rationally based on the witnesses' perception of defendant. At issue is the second element, *i.e.*, whether the testimony

is helpful to a clear understanding of the witnesses' testimony or a determination of fact at issue.

¶ 61   We find Deputy Stewart's testimony was admissible: it was not lay opinion identification testimony. Rather, Stewart merely laid the evidentiary foundation for admission of the video and the still image made from the video. Stewart never identified defendant as the individual depicted in the video but merely referred to the individual as the "subject." Because Stewart did not offer lay opinion identification testimony, the circuit court was not required to engage in the precautionary procedures set forth above. Accordingly, we conclude the circuit court did not err in admitting Stewart's testimony.

¶ 62   We next consider Chief Deputy Sandusky's testimony. He stated he did not "immediately recognize" the individual depicted in the video when he first viewed it. Thereafter, he interviewed defendant. At trial, he testified that the video depicts defendant carrying a bucket, soda bottle, and hose. There is no question the video is clear and fully depicts the subject. There is no evidence Sandusky was generally familiar with defendant. However, we find that Sandusky gained a familiarity with defendant a short time after the recording was made based on his interview with defendant. While the interview may have been short, Sandusky interacted with defendant in a more natural setting and this interaction gave him a perspective the jury would not acquire in its limited exposure to defendant in the courtroom. Thus, there is some basis to conclude Sanduksy was more likely to correctly identify defendant than the jury. However, because the circuit court failed to engage in the precautionary procedures required for law enforcement witnesses, we find the circuit court erred in admitting Sandusky's testimony.

¶ 63   Officer Jackson testified next. Jackson viewed the blurry black and white still image and believed it "resembled" defendant. He further testified when he viewed the video, he was positively able to identify defendant and he identified defendant in court. Jackson's testimony insinuates he had prior contact. However, there is no testimony as to how long he had known defendant, how many times he had seen defendant, and under what conditions or circumstances he had seen defendant. There is nothing in the record to demonstrate any basis which might lead one to conclude Jackson was more likely to correctly identify defendant than the jury. Thus, his testimony was not admissible. Moreover, the circuit court failed to engage in the precautionary procedures required for law enforcement witnesses.

Accordingly, we find the circuit court erred in admitting Jackson's testimony as lay opinion identification testimony.

¶ 64      Joslin testified next on behalf of the State. She testified that Jackson showed her a still image (presumably the color version since she did not testify the image was blurry) and she believed the person depicted was the individual she knew as Jeremy. Joslin had seen defendant on one prior occasion sleeping on the porch of a mutual friend's house. Although the appellate court labeled her as an "informant," there is no basis for that in the record. Additionally, the appellate court found her testimony disparaged defendant's character because it implied the use of drugs. While Joslin was on methamphetamine at the time she observed defendant, she merely saw him sleeping at a mutual friend's house and this does not necessarily insinuate that defendant was involved with drugs or other illegal activities. Although close, we find there was sufficient evidence to provide some basis for concluding Joslin was more likely to correctly identify defendant than the jury. Because Joslin was not a law enforcement officer, the circuit court was not required to engage in the above detailed precautionary procedures. Accordingly, we conclude the circuit court did not err in admitting her testimony.

¶ 65      Lastly, the State offered the testimony of Officer Huff. Huff viewed the black and white still image and, although it was somewhat blurry, he recognized defendant as the individual depicted because of their "previous dealings." Thereafter, he viewed the video and advised his supervisor of his identification. Clearly, Huff had a perspective of defendant that the jury did not have and, therefore, there is some basis to conclude he was more likely to correctly identify defendant than the jury and his testimony was admissible. However, because the circuit court failed to engage in the precautionary procedures required for law enforcement witnesses, we find the circuit court erred in admitting Huff's testimony.

¶ 66      Summarizing, we hold that Deputy Stewart and Joslin's testimony was admissible, but that Chief Deputy Sandusky, Jackson, and Huff's testimony was not admissible.

¶ 67      Nonetheless, we find any error in admitting this testimony harmless. First, the jury heard defendant's confession and other incriminating statements he made regarding his conduct over the previous four to five months. While the appellate court evidently found this confession "inconsequential," we disagree.

¶ 68    Defendant admitted he was the individual depicted in exhibit No. 2. In fact, defendant labeled it "pretty cool," asked for a copy, and even asked if it was going to be in the newspaper. Thereafter, defendant admitted to manufacturing methamphetamine for the previous four to five months and to having stolen anhydrous ammonia from Hamson Ag on four to five other occasions, which he used either to make methamphetamine or trade for cigarette money. Likewise, defendant admitted to purchasing pseudoephedrine over the previous four to five months, which he used in part for the manufacture of methamphetamine. Most important, perhaps, is the fact defendant told Sandusky how he was unsuccessful that day, describing how the hose he brought was too small and that he was "gassed out" by the fumes from the anhydrous ammonia. These statements demonstrate defendant's familiarity with anhydrous ammonia and the production of methamphetamine.

¶ 69    We note that defendant does not challenge any of his statements as involuntary. Rather, his only challenge is based on his recantation at the end of the interview. However, this recantation was unreliable because it differed from the alibi defense defendant offered at trial.

¶ 70    Finally, the jury was repeatedly told by both attorneys and instructed by the court that it was up to the jury to make the ultimate determination of whether defendant was the individual depicted on the video. And, as the State points out, the jury viewed the video twice during deliberations.

¶ 71    For all the reasons set forth above, we find any error in admitting the officers' testimony as lay opinion identification testimony was harmless.

¶ 72                    CONCLUSION

¶ 73    For the above reasons, we reverse the judgment of the appellate court and reinstate defendant's convictions.

¶ 74    Appellate court judgment reversed.

¶ 75    Circuit court judgment affirmed.